## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**LUIS W. LEBRON, individually
and as class representative,**

      **Plaintiff,**

**v.**                                            **Case No.: 6:11-cv-01473-Orl-35DAB**

**DAVID E. WILKINS, in his official
capacity as Secretary of the Florida
Department of Children & Families,**

      **Defendant.**
_____

### ORDER

**THIS CAUSE** comes before the Court upon Plaintiff's Motion for Preliminary Injunction (Dkt. 2), Motion for Class Certification (Dkt. 16) and Reply to Defendant's opposition to preliminary injunctive relief (Dkt. 22), along with the State's responses (Dkt. 19; Dkt. 16) in opposition to Plaintiff's motions.

### I.    INTRODUCTION

The question presented is whether Section 414.0652, Florida Statutes, which requires all applicants for a class of federal welfare benefits to submit to suspicionless drug testing, is constitutional under the Fourth and Fourteenth Amendments. Based on the evidence submitted by the parties on their written submissions and at a hearing on Plaintiff's Motion for Preliminary Injunction, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction against the enforcement of Section 414.0652 against him until

this matter is fully adjudicated by the Court.  On stipulation of the State that it will not seek to enforce the statute against others similarly situated to Plaintiff until the matter is fully resolved, the Court **DENIES** the Plaintiff's Motion for Class Certification (Dkt. 16) without prejudice.

## II.    BACKGROUND

Plaintiff in this case, Luis Lebron, applied to the Florida Department of Children and Families ("DCF") for benefits under the federal Temporary Assistance for Needy Families ("TANF") program in July 2011 to support himself and his minor child.  Lebron Aff. ¶¶ 5, 14 (Dkt. 2-1 at 1, 2.)  Plaintiff has sole custody of his four-year old son and is an undergraduate student at the University of Central Florida with prior military service. Lebron Aff. ¶ 5 (Dkt. 2-1 at 1.)  Though Plaintiff attests that he has never used illegal drugs, Section 414.0652 requires him to submit to drug testing as a condition of eligibility for TANF benefits.  Lebron Aff. ¶ 19 (Dkt. 2-1 at 3.)

Plaintiff refuses to take a drug test because he believes that requiring him to pay for and submit to such a test is unreasonable when there is no reason to believe that he uses drugs.  Lebron Aff. ¶ 19 (Dkt. 2-1 at 3.)  DCF has stipulated that, as of the date of the initiation of this action, Plaintiff is eligible for TANF benefits, aside from his failure to provide proof that he has tested negative for controlled substances.    Berner Aff. ¶ 10 (Dkt. 19-1 at 5; Dkt. 19 at 5.)   Plaintiff contends that Section 414.0652 violates his Fourth Amendment right to be free from unreasonable searches, and he seeks a preliminary injunction on behalf of himself and a class of persons similarly situated to enjoin the State from enforcing this statute as a condition for receipt of TANF benefits.

The TANF block grant program was created by Congress on August 22, 1996, as part of the Personal Responsibility and Work Opportunity Act, 42 U.S.C. §§ 601 *et seq.* The Act was intended to provide states with resources and flexibility to operate programs designed meet the following goals:

(1) provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives;

(2) end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage;

(3) prevent and reduce the incidence of out-of-wedlock pregnancies and establish annual numerical goals for preventing and reducing the incidence of these pregnancies; and

(4) encourage the formation and maintenance of two-parent families.

42 U.S.C. § 601(a).

To become eligible to receive TANF funds, a state must submit a plan that outlines how it intends to administer its program and set eligibility requirements for families that apply for assistance.  42 U.S.C. § 602(a).  States may generally use federal funds "in any manner that is reasonably calculated to accomplish" the purposes of TANF.  42 U.S.C. § 604(a)(1).  As a complement to this provision, 21 U.S.C. § 862b provides: "Notwithstanding any other provision of law, States shall not be prohibited by the Federal Government from testing welfare recipients for use of controlled substances nor from sanctioning welfare recipients who test positive for use of controlled substances."  21 U.S.C. § 862b.  Thus, Congress authorizes states to test welfare recipients for controlled substances and to sanction those who test positive, but it does

not provide guidance on the manner in which states are permitted to do so consistent with constitutional mandates.

Florida began disbursing TANF funds in 1996 pursuant to Chapter 414, Florida Statutes.  <u>See</u> FLA. STAT. § 414.015 *et seq*. (1996).  After holding hearings on welfare reform, the Florida Legislature enacted legislation in 1998 that required DCF[1] to develop and implement a "Demonstration Project" to study and evaluate the "impact of the drug-screening and drug-testing program on employability, job placement, job retention, and salary levels of program participants" and to make "recommendations, based in part on a cost benefit analysis, as to the feasibility of expanding the program," including specific recommendations for implementing such an expansion.  FLA. STAT. § 414.70(1)-(5) (1998) (repealed 2004).

In order to carry out this mandate, DCF designed the Demonstration Project to test empirically (1) whether "individuals who apply for temporary cash assistance or services under the state's welfare program are likely to abuse drugs," and (2) whether "such abuse affects employment and earnings and use of social service benefits." Robert E. Crew, Jr. and Belinda Creel Davis, <u>Assessing the Effects of Substance Abuse Among Applicants for TANF Benefits</u>, 17(1) JOURNAL OF HEALTH & SOCIAL POLICY 39 at 41 (2003) (Dkt. 22-2 at 2). The Legislature instructed DCF to drug test only those individuals whom the department had "reasonable cause to believe" engaged in illegal use of controlled substances.  FLA. STAT. § 414.70(1) (1998) (repealed 2004).  Thus, to

---

[1] At that time, this agency was known as the Florida Department of Children and Family Services.  <u>See</u> FLA. STAT. § 414.70(5)(2) (1998) (repealed 2004).

gather data on the likelihood of TANF applicants to use drugs, DCF, working in conjunction with private contractors, screened over eight thousand applicants for welfare benefits between 1999 and 2001 using a written test designed to differentiate between substance abusers and non abusers, regardless of denial or deliberate deception on the part of the test subject.  Robert E. Crew, Jr. and Belinda Creel Davis, Assessing the Effects of Substance Abuse Among Applicants for TANF Benefits, 17(1) JOURNAL OF HEALTH & SOCIAL POLICY 39 at 41-42, 44 (2003) (Dkt. 22-2 at 2-3, 5).  Of those individuals who were screened, 6,462 continued to receive TANF benefits during the relevant timeframe and were determined to be proper subjects of the study.  Id. at 44.  Based on the results of the screening, 1,447 of the 6,462 TANF applicants were flagged as potential substance abusers and were required to undergo urinalysis.  Id. at 45.  Only 335 of those individuals subjected to drug testing—5.1% of the total population who were screened—tested positive.  Id. at 45.

The results of the Demonstration Project confounded the expectations of the researchers, who observed that "evidence of drug abuse in Florida is substantially lower than the percentages reported in other research on this topic."  Id.  In fact, the percentage of positive drug tests was so low in comparison to previous studies that the researchers opined that the results "raise some questions about the procedures employed by the State to identify drug use among welfare recipients."  Id. 46.  To explain the surprisingly low rate of drug use, the researchers speculated that, as news of the drug testing spread, applicants for TANF benefits took the "opportunity to 'clean' their urine" by abstaining from illegal substances for a period prior to application.  Id.

Notwithstanding the concerns surrounding the methods employed, the concrete scientific evidence gathered clearly undermined the underlying assumption regarding the prevalence of substance abuse among TANF applicants: drug use among the tested TANF population was found to be significantly lower than drug use among welfare recipients in other national studies.   See id. at 45-46.   The results also showed significantly lower rates of drug use among this population than the rate of drug use among the population of Florida at large, which was recently estimated at 8.13 percent. (Dkt. 2 at 16 n.4.)

With respect to the second area of inquiry, whether drug abuse affects employment and earnings and use of social service benefits, the researchers found that (1) there is very little difference between the employment rates and earning capacities of Food Stamps, cash assistance, and Medicaid recipients who screened positive for substance abuse and those who did not; and (2) there is also very little difference on these same variables between those who tested positive on a urinalysis and those who did not. Robert E. Crew, Jr. and Belinda Creel Davis, Assessing the Effects of Substance Abuse Among Applicants for TANF Benefits, 17(1) JOURNAL OF HEALTH & SOCIAL POLICY 39 at 47-48 (2003) (Dkt. 22-2 at 8-9).   That is to say, those welfare recipients who screened and tested positive for the use of illicit substances were found to be just as likely to work and just as likely to use social service benefits as those who screened and tested negative.

Overall, the researchers concluded that the findings of the project raised two implications for social welfare policy:

First, [the findings] emphasize the difficulty of determining the extent of drug use among welfare beneficiaries.  *Any* test utilized for this purpose is likely to provide, at best, an estimate of these numbers. ***Such estimates are suitable only for planning purposes and not for sanctioning.***

Secondly, the findings suggest that states may not need to test for drug use among welfare beneficiaries. Evidence from the Florida demonstration project showed very little difference between drug users and non-users on a variety of dimensions.  ***Users were employed at about the same rate as were non-users, earned approximately the same amount of money as those who were drug free and did not require substantially different levels of governmental assistance.*** If there are no behavioral differences between drug users and non-users and if drug users do not require the expenditure of additional public funds, then policymakers are free to concentrate on other elements of welfare policy and to avoid divisive, philosophy-laden debates.

Id. at 52 (emphasis added).

The preliminary results of the Demonstration Project were reported to the Legislature in an Evaluation Report that recommended that the project not be expanded because of the high costs of drug testing "compared with the benefits derived" and because of the "minimal differences in employment and earnings between those who showed evidence of current substance abuse and those who did not." ROBERT E. CREW, EVALUATION REPORT,[2] at ii-iii (Dkt. 32-1 at 2-3).  The Legislature apparently did not undertake further testing or expanded testing, and the Demonstration Project expired on June 30, 2001, pursuant to a statutory sunset provision.  See FLA. STAT. § 414.70(1) (1998) (repealed 2004).

---

[2] There are two reports on the record that set forth the results of the Demonstration Project: the Evaluation Report (Dkt. 32-1), which was prepared by Robert E. Crew, Jr. for presentation to the legislature pursuant to Section 414.70, and the subsequent published version of the evaluation report, Robert E. Crew, Jr. and Belinda Creel Davis, Assessing the Effects of Substance Abuse Among Applicants for TANF Benefits, 17(1) JOURNAL OF HEALTH & SOCIAL POLICY 39 (2003) (Dkt. 22-2).  Plaintiff filed both studies without objection by the State.

In 2011, the Florida Legislature resurrected the concept of drug testing TANF applicants. No new studies were conducted, and no new data specific to the Florida welfare population was offered. Instead, legislative staff officials turned again to the Demonstration Project, evaluated its data and considered other issued implicated by the proposed suspicionless drug testing program. See FINAL B. ANALYSIS, FLA. H. B. 353 (2011) (Dkt. 22-4); PROFESSIONAL STAFF OF THE BUDGET COMMITTEE, FLA. S. B. ANALYSIS AND FISCAL IMPACT STATEMENT, S. B. 556 (2011) (Dkt. 22-5). Staff analyses provided to the Florida House of Representatives and the Florida Senate considered the legal ramifications of drug testing, citing a number of cases raised by the parties in the filings before this Court. The House analysis cited the line of United States Supreme Court cases dealing with suspicionless drug testing of individuals and noted that the issue had been successfully challenged as unconstitutional in Michigan in the precise context of welfare recipients. FINAL B. ANALYSIS, FLA. H. B. 353 (2011) (Dkt. 22-4 at 4-5.) The staff analysis provided to the Florida Senate inexplicably cited Marchwinski v. Howard, 309 F.3d 330 (6th Cir. 2002) (holding that district court erred in granting preliminary injunction). PROFESSIONAL STAFF OF THE BUDGET COMMITTEE, FLA. S. B. ANALYSIS AND FISCAL IMPACT STATEMENT, S. B. 556 (2011) (Dkt. 22-5 at 6). On the record presented to this Court, it appears that the analysis failed to advise the Senate that the Sixth Circuit Court of Appeals vacated that decision and subsequently affirmed the district court decision by a vote of an evenly divided *en banc* court, thereby reinstating the district court's preliminary injunction enjoining the Michigan statute on constitutional grounds.

See Marchwinski v. Howard, 319 F.3d 258 (6th Cir. 2003), and Marchwinski v. Howard, 60 F. App'x 601 (6th Cir. 2003).

The staff analyses did both summarize the Demonstration Project's findings and conclusions, however.   PROFESSIONAL STAFF OF THE BUDGET COMMITTEE, FLA. S. B. ANALYSIS AND FISCAL IMPACT STATEMENT, S. B. 556 (2011) (Dkt. 22-5 at 3, 7); FINAL B. ANALYSIS, H. B. 353 (2011) (Dkt. 22-4 at 3.)  The legislative staff specifically advised the legislature that the researcher charged with evaluating the project "did not recommend continuation or statewide expansion" of the Demonstration Project, noting:   "Overall research and findings concluded that there is very little difference in employment and earnings between those who test positive versus those who test negative.   Researchers concluded that the cost of the pilot project was not warranted."  PROFESSIONAL STAFF OF THE BUDGET COMMITTEE, FLA. S. B. ANALYSIS AND FISCAL IMPACT STATEMENT, S. B. 556 (2011) (Dkt. 22-5 at 3); FINAL B. ANALYSIS, H. B. 353 (2011) (Dkt. 22-4 at 3.)  Despite the failure of the Demonstration Project to uncover evidence of rampant drug abuse among TANF applicants; despite the conclusion of researchers that drug use did not adversely impact any of the goals of the TANF program, including employability, earning capacity or independence from social assistance; despite the fact that the study revealed no financial efficacy;   despite the legal ramifications;   and,   despite the express recommendation that the project not be continued or expanded, Florida enacted Section 414.0652 on May 31, 2011.

Section 414.0652 requires each individual who applies for TANF funding to take a drug test.   FLA. STAT. § 414.0652(1).  The applicant must initially bear the expense of

the drug testing, which costs between $24 and $45.  FLA. STAT. § 414.0652(1); Duchene

Aff. ¶ 4 (Dkt. 19-2 at 2.)  Drug testing is not conducted at the office of an individual's

physician but instead must take place at an "approved laboratory" authorized by DCF to

administer drug testing.  Berner Aff. ¶ 6 (Dkt. 19-1 at 3.) If the applicant tests negative,

TANF funds will be used to reimburse the applicant for the cost of the drug test.  FLA.

STAT. § 414.0652(2)(a).   A medical review officer reviews all test results and evaluates

positive tests, as various prescription medications being taken at the direction of a

physician can trigger a positive result.  Duchene Aff. ¶ 6 (Dkt. 19-2 at 2.) To avoid being

denied benefits due to legitimate prescription drug use, applicants must inform the

agent administering the drug test that they are taking prescription or over-the-counter

medications and must legitimize their use.  Although this requirement is presented as

optional, if the applicant does not so disclose, the applicant may be denied benefits due

to a positive screening. See FLA. STAT. § 414.0652(2)(d)-(j).   Ultimately, a medical

review officer verifies the validity of any prescriptions provided by the applicant and may

override positive results if appropriate.    Duchene Aff. ¶ 6 (Dkt. 19-2 at 2-3.)  All test

results are provided to DCF.  Duchene Aff. ¶ 6 (Dkt. 19-2 at 3.)

Any applicants who test positive for controlled substances and have no

medically approved excuse for the positive result are immediately sanctioned; they are

rendered ineligible to receive TANF benefits for one year.  FLA. STAT. § 414.0652(1)(b).

However, an applicant may reapply after 6 months and may receive benefits if the

individual successfully completes a substance abuse treatment program and passes a

drug test, the costs of which are to be borne by the applicant.    FLA. STAT. §

414.0652(2)(j).  If an adult tests positive for illicit drug use, children in the family may still receive benefits if another approved adult, referred to as a "protective payee," provides a negative drug test for controlled substances.  FLA. STAT. § 414.0652(3)(b)-(c).

DCF shares all positive drug tests for controlled substances with the Florida Abuse Hotline.  Berner Aff. ¶ 9 (Dkt. 19-1 at 4.)  After receiving a positive drug test, a hotline counselor enters a Parent Needs Assistance referral into a child welfare database known as the Florida Safe Families Network.  Berner Aff. ¶ 9 (Dkt. 19-1 at 4.) A referral is then prepared so that the adult who tested positive may receive a list of substance abuse treatment programs and so that "other appropriate response to the referral in the particular county of residence of the applicant" may be taken.  Berner Aff. ¶ 9 (Dkt. 19-1 at 4.)  The statute governing the Florida Abuse Hotline authorizes the disclosure of records from the abuse hotline to "[c]riminal justice agencies of appropriate jurisdiction," as well as "[t]he state attorney of the judicial circuit in which the child resides or in which the alleged abuse or neglect occurred."  FLA. STAT. § 39.202(2)(b)-(c).  Law enforcement officials may access the Florida Safe Families Network and make such use of the data as they see fit.  Preliminary Injunction Hearing at 10:58 A.M. (Drew Parker, attorney for DCF); see also FLA. STAT. § 39.202(2)(b)-(c).  However, the Parent Needs Assistance referral does not trigger formal reports of child abuse or neglect, which are governed under Chapter 39, Florida Statutes.

Section 414.0652 became effective July 1, 2011, and drug testing began in earnest during the month of July.  FINAL B. ANALYSIS, H. B. 353 (2011) (Dkt. 22-4 at 1); Berner Aff. ¶ 6 (Dkt. 19-1 at 3.)  The preliminary results from the drug testing conducted

pursuant to Section 414.065 reveal even lower drug use among TANF applicants than demonstrated by the results of the Demonstration Project.  Evidence adduced on this record suggests that preliminary tests show that only about 2 percent[3] of TANF applicants tested positive in the first month of drug testing.  (Dkt. 19 at 8; Dkt. 2 at 16.)

The State argues that all denials of benefits to TANF applicants who refuse to take the drug test after being determined otherwise eligible should be considered "drug related denials."[4]   Yet, it is difficult to draw any conclusions concerning the extent of drug use or the deterrent effect of the statute from this fact because declining to take the drug test can be attributed to a number of factors in addition to drug use, including an inability to pay for the testing, a lack of laboratories near the residence of an applicant, inability to secure transportation to a laboratory or, as in the case at bar, a refusal to accede to what an applicant considers to be an unreasonable condition for receiving benefits.  No evidence on the distribution of these other factors among those who have declined to be tested has been adduced.  Whatever the reason for the failure or refusal to test, the empirical data to date has only demonstrated that 2 percent to 5.1

---

[3] The State suggested initially at the Hearing that there might be a discrepancy in this low number but later stated on the record that "we know that about two percent are testing positive." In any case, the State has not sought to introduce evidence of a higher percentage of actual positive drug tests among TANF applicants based on the initial results of the drug testing.  The pamphlet the State introduces on this point states that **only 9 people** of the 574 denials through the end of July actually tested positive for drug use. Tarren Bragdon, The Impact of Florida's New Drug Test Requirement for Welfare Cash Assistance, FOUNDATION FOR GOVERNMENT ACCOUNTABILITY, September 2011 at 4 (Dkt. 19-8 at 2.) Although this would equate to approximately 2 percent of those who were denied, it is far less than 2 percent of the overall total number tested.  For purposes of its analysis, the Court considers the overall 2 percent positive test results figure cited by the parties.  Perhaps the parties can more fully address these numbers as the case progresses.

[4] The State uses a 9.8 percent number to quantify drug related denials based a refusal to take a test, but this number appears to conflate the 7.6 percent of those who are denied based on because they have not submitted any test results and the 2 percent of those who have tested positive.

percent of Florida's TANF applicants are drug users.  Conversely, the data suggests that 94.9 to 98 percent are not drug users.  Yet, all must submit to suspicionless drug testing or forego receipt of TANF benefits.

## I.   DISCUSSION

Plaintiff argues that requiring all applicants for TANF benefits to submit to a suspicionless drug test violates the Fourth Amendment's prohibition against unreasonable searches and that preliminary injunctive relief is required to avoid the irreparable harm that will befall him and others similarly situated without the issuance of an injunction.  (Dkt. 2 at 1.)  The State offers four rejoinders: (1) the Section 414.0652 requirement for acquiescence to a drug test is not a search within the meaning of the Fourth Amendment; (2) Section 414.0652 is justified by the "special needs" of the State to conduct drug testing within the ambit of its administration of TANF funds; (3) Plaintiff will suffer no irreparable harm in the absence of an injunction because he is free to refuse the drug test; and (4) the public interest lies in ensuring that public funds are expended for their intended purposes and not in ways that will endanger the public. (Dkt. 19 at 9-27.)

A district court may grant a preliminary injunction only upon the movant's showing that (1) it has a substantial likelihood of success on the merits, (2) the movant will suffer irreparable injury unless the injunction is issued, (3) the threatened injury to the movant outweighs the possible injury that the injunction may cause the opposing party, and (4) if issued, the injunction would not disserve the public interest.  Horton v. City of St. Augustine, Fla., 272 F.3d 1318, 1326 (11th Cir. 2001); Scott v. Roberts, 612

F.3d 1279, 1290 (11th Cir. 2010).  The Court will address each of these considerations in turn.

### a.    Likelihood of Success on the Merits

The Court finds that Plaintiff has demonstrated that, on the current record, there is a substantial likelihood that his challenge to the constitutionality of Section 414.0652 under the Fourth Amendment will succeed.

1.    <u>Urinalysis Testing for the Presence of Drugs Constitutes a Search under the Fourth Amendment</u>

It is well established that a drug test is considered a search under the Fourth Amendment.  <u>Skinner v. Ry. Labor Executives' Ass'n</u>, 489 U.S. 602, 617 (1989); <u>Nat'l Treasury Employees Union v. Von Raab</u>, 489 U.S. 656, 665 (1989); <u>Chandler v. Miller</u>, 520 U.S. 305, 313 (1997); <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646 (1995); <u>Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls</u>, 536 U.S. 822 (2002). In <u>Skinner</u>, the seminal case on this issue, the Supreme Court held that the "collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable"[5] and that "these intrusions must be deemed searches under

---

[5] Against this controlling authority, the Court declines the State's invitation (Dkt. 24) to review current private organizations' practices or public opinion polls to conclude that there no longer exists a reasonable expectation of privacy against state intrusion via urinalysis drug testing. Private employers are not constrained by the limits of the Fourth and Fourteenth Amendment in this regard.

the Fourth Amendment." <u>Skinner</u>, 489 U.S. at 617; <u>Vernonia</u>, 515 U.S. at 658 ("collecting the samples for urinalysis intrudes upon 'an excretory function traditionally shielded by great privacy'") (quoting <u>Skinner</u>, 489 U.S. at 626); <u>Nat'l Treasury Employees Union v. Von Raab</u>, 816 F.2d 170, 175 (5th Cir. 1987) <u>aff'd</u> <u>in</u> <u>part</u>, <u>vacated in</u> <u>part</u> <u>and</u> <u>remanded</u>, 489 U.S. 656 (1989) ("There are few activities in our society more personal or private than the passing of urine.  Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.") (quoted in <u>Skinner</u>, 489 U.S. at 617); <u>see</u> <u>also</u> <u>Schmerber v. California</u>, 384 U.S. 757, 768 (1966) ("compelled intrusion into the body for blood to be analyzed for alcohol" is a search under the Fourth Amendment).

Notwithstanding the overwhelming body of case law to the contrary, the State contends that the drug testing of welfare recipients is not a search. (Dkt. 19 at 9.) According to the State, the drug test is not forced or compelled, and, if there is no consent to the testing, there is no drug test and, thus, no search.  (Dkt. 19 at 11.)  For support, the State relies upon <u>Wyman v. James</u>, 400 U.S. 309 (1971).  In <u>Wyman</u>, the Supreme Court concluded that requiring a welfare recipient to consent to a home visit in order to be deemed eligible for welfare benefits did not constitute a search.   In so holding, the Court observed that the home visit "in itself is not forced or compelled. . . . If consent to the visitation is withheld, no visitation takes place.  The aid then never begins or merely ceases, as the case may be.  There is no entry of the home and there is no search."  <u>Wyman</u>, 400 U.S. at 317-18.  Defendant contends that the principles

announced in <u>Wyman</u> control the outcome of this case and compel the conclusion that Section 414.0652 does not implicate a search.  (Dkt. 19 at 11.)

The Court finds this argument unpersuasive.   The principal and dispositive difference between this case and <u>Wyman</u> is the nature of the intrusion demanded.  In <u>Wyman</u>, the Court characterized the home visit to be primarily "rehabilitative" in nature and cautioned against placing too much emphasis on its investigatory character. <u>Wyman</u>, 400 U.S. at 317.  The Court reasoned that the caseworker was "not a sleuth but rather . . .  a friend to one in need," and, although the caseworker might have observed matters in the home that revealed fraud or issues requiring further review, the parameters of the visit did not permit snooping or intrusion beyond sitting in the living room having a conversation. <u>Id.</u> at 321, 323.  It also recognized that the home visit had become "an established routine in States besides New York" and that the home visit formed the ""heart of the welfare administration."" <u>Wyman</u>, 400 U.S. at 320 (quoting Note, <u>Rehabilitation, Investigation and the Welfare Home Visit</u>, 79 Y<small>ALE</small> L.J. 746, 748 (1970)).   The Supreme Court has never extended the holding of <u>Wyman</u> outside the context of the home visit in the manner urged by the State.[6]

The post-<u>Wyman</u> cases dealing with suspicionless drug testing further confirm that the urinalysis at issue here is a search and negate the State's contrary contention. The Supreme Court has "routinely treated urine screens taken by state agents as searches within the meaning of the Fourth Amendment," <u>Ferguson v. City of Charleston</u>,

---

[6] <u>See</u>, <u>Sanchez v. County of San Diego</u>, 464 F.3d 916, 922, n. 8 (9th Cir. 2006), <u>cert. denied</u>, 552 U.S. 1038 (2007) (applying <u>Wyman</u> in a home visit context with slightly more intrusive aspects but noting that <u>Wyman</u>'s holding that home visits are not searches had been "called into question by the Supreme Court's subsequent Fourth Amendment jurisprudence").

532 U.S. 67, 77 n.9, regardless of whether the person subjected to the test has the opportunity to refuse it.  See Chandler, 520 U.S. at 313 (drug testing of prospective political candidates considered to be a search); Vernonia, 515 U.S. 646 (policy requiring high school students to sign a form consenting to testing in order to play sports considered a search); Earls, 536 U.S. 822 (policy requiring middle school and high school students to consent to drug testing as a condition for participation in extracurricular activities held a search); Von Raab, 489 U.S. at 665 (drug testing as a condition for employment in certain U.S. Customs Service positions held to be a search).

In short, this case does not concern home visits; it concerns the collection of an individual's urine, an act that necessarily entails intrusion into a highly personal and private bodily function, and the subsequent urinalysis, which can reveal a host of private medical facts about that individual.  Skinner, 489 U.S. at 617.  The intrusion here also extends well beyond the initial passing of urine.  Positive drug tests are not kept confidential in the same manner as medical records; they are shared with third-parties, including DCF, medical reviewers and counselors for the Florida Abuse Hotline.  More troubling, positive test results are memorialized, perhaps indefinitely, in a database that the State admits can be accessed by law enforcement.  This potential interception of positive drug tests by law enforcement implicates a "far more substantial" invasion of privacy than in ordinary civil drug testing cases.  See Ferguson, 532 U.S. at 78.  In light of the inherently investigative character of the drug test and binding legal authority, the

Court rejects the argument that a drug test taken pursuant to Section 414.0652 is not a search within the meaning of the Fourth Amendment.

    2.   <u>Plaintiff's Initial Consent, Now Revoked, Does not Bar His Claim</u>

The State is correct that a search conducted with consent does not give rise to a constitutional violation. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). It is uncontested that Plaintiff electronically signed a "Drug Testing Information and Consent Form," which is clear evidence of his consent to be drug tested. However, completion of that form was required in order for DCF to process Plaintiff's application. Berner Aff. ¶ 7 (Dkt. 19-1 at 3.) Without DCF's initial approval of his application, Plaintiff's claim would have likely been barred by the ripeness doctrine, which serves to protect federal courts from "engaging in speculation or wasting their resources through the review of potential or abstract disputes." <u>Digital Props., Inc. v. City of Plantation</u>, 121 F.3d 586, 590 (11th Cir. 1997) (First Amendment claim not sufficiently mature for judicial review). Plaintiff has since unequivocally revoked his consent to be searched by refusing to take the drug test and by filing this action. Lebron Aff. ¶ 21 (Dkt. 2-1 at 3.) Under these facts, the Court finds that Plaintiff's initial consent does not bar the invocation of his rights under the Fourth Amendment to be free from suspicionless drug testing under Section 414.0652.

Even if Plaintiff's consent were not revoked, the State's exaction of consent to an otherwise unconstitutional search in exchange for TANF benefits would violate the doctrine of unconstitutional conditions. <u>See</u> <u>Perry v. Sindermann</u>, 408 U.S. 593, 597

-18-

(1972) (collecting cases and observing that "even though a person has no 'right' to a valuable governmental benefit," the government may not "deny a benefit to a person on a basis that infringes his constitutionally protected interests"); see also Bourgeois v. Peters, 387 F.3d 1303, 1324 (11th Cir. 2004) ("The doctrine of unconstitutional conditions prohibits terminating benefits, although not classified as entitlements, if the termination is based on motivations that other constitutional provisions proscribe.") (quotations omitted); United States v. Scott, 450 F.3d 863, 866 (9th Cir. 2006) (waiver of Fourth Amendment rights is limited by unconstitutional conditions doctrine).

     3.     The State has not Demonstrated Any "Special Need" for
               Drug Testing All TANF Applicants

Because Florida's drug testing program authorizes suspicionless searches, Florida must establish that the interests it advances to demand such searches without probable cause or reasonable suspicion meet the "Special Needs" exception to the Fourth Amendment.   The Fourth Amendment, as applicable to the states through the Fourteenth Amendment, does not prohibit all searches; only unreasonable searches are unconstitutional.   Skinner, 489 U.S. at 619.   "To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." Chandler, 520 U.S. at 313.

One exception to this rule arises when the government can demonstrate "exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." New

Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring); see also Skinner, 489 U.S. at 619.   As the Supreme Court has noted, "Our precedents establish that the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."  Chandler, 520 U.S. at 318.  When special needs are alleged in justification of a Fourth Amendment intrusion, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." Id. at 314.

The special needs exception arises out of circumstances in the administrative context in which the practice of obtaining a warrant would simply not be feasible.   In Skinner, for instance, the Federal Railroad Administration found that alcohol and drug abuse by railroad employees posed a serious threat to safety, and in response it promulgated regulations that required employees involved in train accidents to take blood and urine tests.  Skinner, 489 U.S. at 606.  The Supreme Court recognized that the delay required to procure a warrant could result in the destruction of valuable evidence of drug and alcohol use, and that adherence to normal probable cause and warrant requirements would frustrate the compelling government interest in railway safety.  Id. at 623.  Thus, the administrative necessity of investigating the cause of an accident justified resort to the special needs doctrine.  Id. at 623.

Similarly, in the context of public schools, the Supreme Court has determined that "strict adherence to the requirement that searches be based upon probable cause" would "unduly interfere with the maintenance of swift and informal disciplinary

procedures" and would detract from "the substantial need of teachers and administrators for freedom to maintain order in the schools." Vernonia, 515 U.S. at 653 (quoting New Jersey v. T.L.O., 469 U.S. 325, 340 (1985)).  In contrast, the Tenth Circuit has found that the special needs doctrine could not justify an intrusive, nonconsensual physical examination of preschoolers because parental notice and consent to the searches were not impracticable.  Dubbs v. Head Start, Inc., 336 F.3d 1194, 1215 (10th Cir. 2003).

The viability of alleged special needs also depends upon the substantiality of the governmental interest asserted.  Chandler, 520 U.S. at 318.  In drug testing cases, an interest will be considered substantial if the government shows that the drug testing is warranted by "surpassing safety interests."  Skinner, 489 U.S. at 634.  Likewise, suspicionless drug testing has been deemed justified where the individuals who are to be tested are employed in a particularly sensitive capacity implicating peculiar affairs or missions of the government, such as law enforcement agents involved in drug interdiction.  See, e.g., Von Raab, 489 U.S. at 669.  Finally, the Supreme Court has approved of suspicionless drug testing in public schools because of "the need to prevent and deter the substantial harm of childhood drug use," Earls, 536 U.S. at 835, and because the schools have taken on a "custodial and tutelary responsibility for children" in the special confines of the school setting.  Vernonia, 515 U.S. at 656.

But the special needs exception is reserved for "exceptional circumstances," T.L.O., 469 U.S. at 351, and not every alleged governmental interest will fit within the "closely guarded category of constitutionally permissible suspicionless searches."

Chandler, 520 U.S. at 309.   In Chandler, the Supreme Court considered the constitutionality of a statute that required candidates for certain elected offices to submit to drug testing as a condition of qualification for candidacy.  Id. at 309.  The State of Georgia cited as a special need the "incompatibility of unlawful drug use with holding high state office" and argued that the "use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions; . . . and undermines public confidence and trust in elected officials."  Id. at 318. The State of Georgia also argued that the statute "serves to deter unlawful drug users from becoming candidates and thus stops them from attaining high state office."  Id.

Rejecting this rationale, the Supreme Court found that Georgia failed to demonstrate a sufficiently substantial special need.  The Court noted that Georgia conceded that the statute was "not enacted in response to any fear or suspicion of drug use by state officials" and that the cited reasons did not present "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule."  Id. at 319.  The Court also opined that the drug testing regime was "not well designed" to identify drug users because all of those drug users "save for those prohibitively addicted, could abstain for a pretest period sufficient to avoid detection."  Id. at 320-21. In the absence of any showing that the statute responded to anything more than a "symbolic" need, the Court held that the need asserted did not justify the suspicionless drug testing.  Id. at 309, 322.

Applying this analysis to the facts of this case and considering the evidence adduced to date, the Court finds the State has not demonstrated a substantial special

need to justify the wholesale, suspicionless drug testing of all applicants for TANF benefits.  The State maintains that the following interests qualify as special needs:  (1) ensuring that TANF funds are used for their dedicated purpose, and not diverted to drug use; (2) protecting children by "ensuring that its funds are not used to visit an 'evil' upon the children's homes and families;" (3) ensuring that funds are not used in a manner that detracts from the goal of getting beneficiaries back to employment; (4) ensuring that the government does not fund the "public health risk" posed by the crime associated with the "drug epidemic."  (Dkt. 19 at 18-22.)

These goals are undeniably laudable objectives.  However, these stated goals can be found nowhere in the legislation, and with good reason: the State's commissioned study undercuts each of these rationales as a likely feature of the proposed legislation.  As noted, researchers found a lower rate of drug usage among TANF applicants than among current estimates of the population of Florida as a whole. This would suggest that TANF funds are no more likely to be diverted to drug use or used in a manner that would expose children to drugs or fund the "drug epidemic" than funds provided to any other recipient of government benefits. The researchers also found no evidence that TANF recipients who screened and tested positive for the use of illicit substances were any less likely to find work than those who screened and tested negative.   The Florida Legislature, in fact, enacted the Section 414.0652 over the express recommendation of its own researchers *not* to expand the Demonstration Project statewide because it was not shown to meet these goals.

In this litigation, the State provides scant evidence that rampant drug abuse exists among this class of individuals.  It relies on three studies in support of its position. The first is a policy brief prepared by the National Poverty Center, which the State cites for its data estimating that twenty one percent of welfare recipients self-reported using drugs in the previous year, mostly marijuana.  Jayakody et al., Substance Abuse and Welfare Reform, NATIONAL POVERTY CENTER POLICY BRIEF # 2 (National Poverty Center) April 2004 at 2-3; (Dkt. 19-5 at 2).  The Court finds this study lacks any probative value on the issue presented.  The State concedes that the study relies on data from 1994 and 1995; the study is not specific to Florida; and the study is not of the same population being considered here, but a much larger recipient, demographic and geographic population than the TANF recipients being tested here.  Moreover, the study posits that, although illicit drug use is more prevalent among women receiving welfare benefits, "only a small minority of recipients (about 4 percent) satisfied the diagnostic screening for illicit drug dependence (i.e. drug use impacted their functioning in significant ways."  Id. at 2.

Even less probative of the State's position is the second cited study, which relies upon data dating back nearly 20 years to 1992 and concludes that "contrary to common characterizations" only "small percentages"—3.8 percent to 9.8 percent—of national recipients of AFDC, WIC and food stamps use drugs.  Bridget F. Grant and Deborah A. Dawson, Alcohol and Drug Use, Abuse, and Dependency among Welfare Recipients, 86 AM. J. PUB. HEALTH 1450, 1453 (1996) (Dkt. 19-6 at 3).  This study also considers evidence of a broader population than TANF applicants.

Similarly, the third study offered by the State, which uses data from Women's Employment Surveys taken between 1997 and 1999 and a 1997 National Household Survey of Drug Abuse, estimates drug dependency among respondents to be between 3.2 and 4.4 percent.  Harold Pollack et al., <u>Drug Testing Welfare Recipients – False Positives, False Negatives, Unanticipated Opportunities</u> (2001) (Dkt. 19-7 at 5, 11.)  The only more significant numbers are based on self-reports of TANF recipients of any drug use within the previous year.  <u>Id.</u> at 6.  Again, this study considers data that is outdated and is not specific to Florida TANF beneficiaries.  Its authors also conclude that psychiatric disorders are a more prevalent problem than drug dependence and suggest that drug testing should be "focused only on recipients who experience tangible drug-related economic barriers or threats to family functioning."  <u>Id.</u> at 11, 13.  These studies do not support the conclusion that drug abuse is a "concrete danger" among the class of citizens the State seeks to drug test.  <u>See</u> <u>Chandler</u>, 520 U.S. at 319.  Moreover, there is no evidence that any of these studies were considered by the legislature when it promulgated the statute.

Perhaps more damaging than its failure to provide evidence in support of its alleged special needs is the State's failure to address the only competent evidence before the Court on this issue: (1) the results from the Demonstration Project commissioned by the Florida Legislature to study the scope of the perceived problem of drug abuse among Florida's TANF applicants and the concomitant benefits of drug testing; and, (2) the preliminary results from the drug testing conducted thus far pursuant to Section 414.0652.  This evidence suggests that TANF applicants can be

expected to test positive between 2 and 5.1 percent of the time.  This percentage range falls well below current estimates of the rate of drug use among the general population of Florida.    More importantly, the researchers have concluded that the benefits ostensibly to be served by this legislation will not be reaped—and no evidence has been offered yet to discredit those findings.

Faced with this evidence, the State argues that it can, nevertheless, establish special needs without a showing of an overwhelming drug problem in the tested population.  (Dkt. 19 at 22 n.15.)  In this regard, the State invokes the concern for the wellbeing of children that served as a special need in Earls and the concerns for public safety and crime risks that justified the special needs in Von Raab.  (Dkt. 19 at 19-20, 21.)  It is true that the Supreme Court did not require overwhelming evidence of a drug problem among the specific populations to be tested in those cases.  See Von Raab, 489 U.S. at 673-75; Earls, 536 U.S. at 835.  However, the Chandler Court made clear that the Von Raab decision is "[h]ardly a decision opening broad vistas for suspicionless searches;" instead, it is a decision that "must be read in its unique context."  Chandler, 520 U.S. at 321.  The Chandler Court explained that the preventative drug testing in Von Raab was warranted because the customs employees who served as the "first line of defense" against the smuggling of illicit narcotics were "routinely exposed to the vast network of organized crime that is inextricably tied to illegal drug use."  See id. at 316, 321 (quotation to Von Raab omitted).

Unlike Von Raab, where the Supreme Court excused the absence of evidence because smuggling posed a threat to national border security, there is no "veritable

-26-

crisis" demonstrated on this record that demands preventative measures.  See Von Raab, 489 U.S. at 668.  Though the State speaks in generalities about the "public health risk, as well as the crime risk, associated with drugs" being "beyond dispute," it provides no concrete evidence that those risks are any more present in TANF applicants than in the greater population. (Dkt. 19 at 21.)  Rather, the evidence suggests that those risks are less prevalent among TANF applicants.   The Court, therefore, rejects the suggestion that the inchoate public health or crime risks assertions incanted by the State justify the Fourth Amendment intrusions mandated by Section 414.0652.

Nor is the drug testing analogous to the preventative drug testing program approved of in Earls.  In Earls, as in prior and subsequent public school drug testing cases, the subjects of the drug tests were vulnerable students, and the school district's custodial or tutelary responsibility towards those students justified early, preventative intervention through drug testing.  Earls, 536 U.S. at 835, 830.  The Supreme Court also considered evidence of a "nationwide drug epidemic" that had "grown worse" since its decision in Vernonia in 1995 upholding the constitutionality of drug testing of student athletes.  Id. at 834.  Specifically, the Court pointed out that "the number of 12th graders using any illicit drug increased from 48.4 percent in 1995 to 53.9 percent in 2001. The number of 12th graders reporting they had used marijuana jumped from 41.7 percent to 49.0 percent during that same period."  Id. at 834 n.5.  This evidence on the "nationwide drug epidemic ma[de] the war against drugs a pressing concern in every school."  Id. at 834.

The Court also considered "specific evidence of drug use at Tecumseh schools," including the testimony of teachers that they had observed students under the influence of drugs and had heard students speaking openly about the use of drugs. Id. at 834-35. The school board also provided other anecdotal evidence, including the discovery of "marijuana cigarettes near the school parking lot" and "drugs or drug paraphernalia in a car driven by a Future Farmers of America member." Id. at 835. The Supreme Court concluded that the school board had "provided sufficient evidence to shore up the need for its drug testing program." Id. Importantly, Earls was decided on summary judgment after an opportunity to offer up competent evidence. Considering, as the Court must, this record as it is currently presented, there is no evidence at this stage of the litigation comparable to the evidence presented in Earls regarding drug use by TANF applicants, and there is no evidence that the children of these applicants are at any heightened risk from the dangers of drug abuse.

On this point, the State contends that by being the conduit for a maximum of $241 per month in federal cash assistance for a finite period of time to TANF applicants, it somehow "steps into the role of the parent" in the same manner as the school board in Earls. (Dkt 19 at 20.) This contention is without merit. At the point at which the drug test is demanded, the State has not made a TANF contribution for the benefit of the children. Moreover, the children affected by Section 414.0652 remain in the custody of their caretakers, not the State, regardless of whether the caretaker tests positive for drugs and regardless of whether Florida withholds TANF benefits as a consequence. Even if the State did assume some authority over the children, it does not follow that the

State would be justified in drug testing their parents, whose role the State suggests it supplants, and <u>Earls</u> does not so hold.

This untenable suggestion also implicates the concerns raised in <u>Marchwinski v. Howard</u>, 113 F. Supp. 2d 1134 (E.D. Mich. 2000), regarding the danger of unquestioned deference to the assertion of this interest:

> If the State is allowed to drug test [TANF] recipients in order to ameliorate child abuse and neglect by virtue of its financial assistance on behalf of minor children, that excuse could be used for testing the parents of all children who receive Medicaid, State Emergency Relief, educational grants or loans, public education or any other benefit from the State.  In all cases in which the State offers a benefit on behalf of minor children, the State could claim that it has a broad interest in the care of those children which overcomes the privacy rights of the parents.

<u>Marchwinski v. Howard</u>, 113 F. Supp. 2d 1134, 1142 (E.D. Mich. 2000) <u>aff'd</u>, 60 F. App'x 601 (6th Cir. 2003) (affirmed on rehearing by evenly divided *en banc* panel).[7]  In light of this concern and in the absence of a showing that Section 414.0652 was promulgated in response to any concrete danger to the children of Florida's TANF recipients, the Court declines to extend the special need for drug testing public school students to the facts of this case.

The State's asserted interest in ensuring that drug use does not frustrate TANF's statutory goal of getting beneficiaries back to employment is, likewise, unsupported on

---

[7] The State repeatedly quotes and cites to <u>Marchwinski v. Howard</u>, 309 F.3d 330 (6th Cir. 2002) (holding that district court erred in granting preliminary injunction) <u>vacated by</u> 319 F.3d 258 (6th Cir. 2003), despite the fact that this decision has been vacated and therefore has no precedential value.  <u>See</u>, <u>e.g.</u>, <u>Whole Health Chiropractic & Wellness, Inc. v. Humana Med. Plan, Inc.</u>, 254 F.3d 1317, 1320 n.3 (11th Cir. 2001) (noting that <u>In re First Nat'l Bank of Boston</u>, 70 F.3d 1184 (11th Cir. 1995) "lacks precedential value, as it was vacated"); <u>Iranian Students Ass'n v. Edwards</u>, 604 F.2d 352, 354 n.4 (5th Cir., 1979) (reliance on <u>Henderson v. Fort Worth Indep. Sch. Dist.</u>, 574 F.2d 1210 (5th Cir. 1978) was "totally inapposite" because the "vacating of that decision deprives it of precedential value").

the evidence of record.  Even if this interest qualified as a special need, <u>see</u> <u>contra</u> <u>Marchwinski</u>, 113 F. Supp. 2d at 1140,[8] the evidence does not support its application here.  The special needs exception rests on the assumption that the drug testing will actually redress the problem that gives rise to the special need, and the justification for the special needs exception loses force when the drug testing and its attendant consequences would prove ineffective.  <u>See</u> <u>Chandler</u>, 520 U.S. at 319-320.

The asserted benefit of getting TANF beneficiaries back to work is not supported by any tangible evidence, however.  The only evidence on this point soundly refutes it. The State's Demonstration Project study emphatically concluded that "whether or not a person tested positively for drug abuse on the urinalysis affected very little their likelihood of working."  Robert E. Crew, Jr. and Belinda Creel Davis, <u>Assessing the</u> <u>Effects of Substance Abuse Among Applicants for TANF Benefits</u>, 17(1) JOURNAL OF HEALTH & SOCIAL POLICY 39 at 42, 48 (2003) (Dkt. 22-2 at 9).  Thus, the interest of getting TANF applicants back to work is not a demonstrated or concrete special need, and, even if it were, the evidence of record does not suggest it would be furthered by the drug testing program in any event.

When the asserted concerns regarding public safety, the wellbeing of children and the employment of TANF applicants are stripped away, the State is left with only one alleged special need:  the interest in preserving public funds by ensuring that money that is intended for one purpose is not used instead to purchase illegal drugs.

---

[8] The <u>Marchwinski</u> Court found that the goal of moving welfare recipients to work does not fit into any "closely guarded category of constitutionally permissible suspicionless searches" such that it would qualify as a special need.  <u>Marchwinski</u>, 113 F. Supp. 2d at 1140 (quoting <u>Chandler</u>, 520 U.S. at 309).

(Dkt. 19 at 18.)   Again, this is a commendable governmental purpose, and one that courts have found relevant to the special needs analysis.  See, e.g., Sanchez, at 928 (home visits for the purpose of verifying eligibility of welfare benefits and reducing welfare fraud held to be justified by a special need).

Chandler teaches, however, that it is not enough to simply recite a governmental interest without any evidence of a concrete threat that would be mitigated through drug testing.  Chandler, 520 U.S. at 322; see also Ferguson, 532 U.S. at 81 (observing that the Court does "not simply accept the State's invocation of a 'special need'" but instead must carry out "'close review' of the scheme at issue" before determining whether the need is special as that term has been defined through Supreme Court precedent) (quoting Chandler, 522 U.S. at 322).

The State has not shown by competent evidence that any TANF funds would be saved by instituting a drug testing program. The State, of course, concedes the substantial cost of administering the program: everyone who tests negative must be reimbursed for the cost of the drug test.  FLA. STAT. § 414.0652(2)(a). Thus, millions of TANF dollars will be spent funding drug tests.

Though the State offers, as evidence of the cost savings, a pamphlet from the Foundation for Government Accountability[9] entitled, The Impact of Florida's New Drug Test Requirement for Welfare Cash Assistance, the data contained in the pamphlet is

---

[9] The Foundation for Government Accountability, a non-profit organization that "believes personal liberty and private enterprise are key to Florida's economic future," "develops and promotes free market public policies that achieve limited, constitutional government and a robust economy that will be an engine for job creation across the state."  Tarren Bragdon, The Impact of Florida's New Drug Test Requirement for Welfare Cash Assistance, FOUNDATION FOR GOVERNMENT ACCOUNTABILITY, September 2011 at 4 (Dkt. 19-8 at 4.)

not competent expert opinion, nor is it offered as such, nor could it be reasonably construed as such. Tarren Bragdon, <u>The Impact of Florida's New Drug Test Requirement for Welfare Cash Assistance</u>, FOUNDATION FOR GOVERNMENT ACCOUNTABILITY, September 2011 at 1 (Dkt. 19-8 at 1.)  Even a cursory review of certain assumptions in the pamphlet undermines its conclusions. Just by way of example, the pamphlet suggests that the State will save millions in the first year; but it arrives at this number by extrapolating from the 9.6 percent of TANF applications that are denied for "drug-related" reasons, including those who tested positive and those who declined to be tested.  <u>Id.</u> at 1.  It extends these hypothetical savings for the full year that a TANF applicant who tested positive for drugs would be subject to losing benefits.  <u>Id.</u> at 2-3.

However, the results show that 7.6 percent of this 9.6 percent figure is comprised of applicants who have declined to be tested.  These "non-testers" cannot be reasonably counted as providing twelve months of savings, or so-called "annualized savings," because they are otherwise eligible and can begin receiving benefits at any point during the year by submitting a new application and a negative drug test.  Even as to those 2 percent of applicants who are known drug users, "annualized savings" calculations inflate the claimed savings because those applicants do not have to forego an entire year of TANF assistance but may reapply after 6 months.  FLA. STAT. § 414.0652(2)(j).  Additionally, the staff analysis presented to the Florida Senate advised the Senate that denials caused by positive tests cannot be relied upon to produce a net savings figure for the additional reason that the "protective payee" provision of the statute allows another adult family member who provides a negative drug test to receive

the same funds that are purported to be saved.  See PROFESSIONAL STAFF OF THE BUDGET COMMITTEE, FLA. S. B. ANALYSIS AND FISCAL IMPACT STATEMENT, S. B. 556 (2011) (Dkt. 22-5 at 6); FLA. STAT. § 414.0652(3)(b).  Therefore, on this record, the State has not demonstrated any financial benefit or net savings will accrue as a result of the passage of Section 414.0652.

To this, the State invokes the government's general interest in fighting the "war on drugs" and the associated ills of drug abuse generally to contend that TANF funds should not be used to fund the drug trade.  The Court agrees.  But, if invoking an interest in preventing public funds from potentially being used to fund drug use were the only requirement to establish a special need, the State could impose drug testing as an eligibility requirement for every beneficiary of every government program.  Such blanket intrusions cannot be countenanced under the Fourth Amendment.

What the Fourth Amendment requires is that such incursions by the Government must be reserved for demonstrated special needs of government or be based on some showing of reasonable suspicion or probable cause.  The State has made no showing that it would be "impracticable" to meet these prerequisites in the context of TANF recipients.  Any suggestion that it would be impracticable should be based on some evidentiary showing, and any such showing would likely be belied by the fact that other states competently administer TANF funds without drug tests or with suspicion-based drug testing and no other state employs blanket suspicionless drug testing.

Even if one ascribes to the view that one of the "happy incidents of the federal system" is that a "single courageous State may, if its citizens choose, serve as a

laboratory; and try novel social and economic experiments without risk to the rest of the country,"[10] Florida has already conducted its experiment.   It commissioned a Demonstration Project that proceeded unchallenged, and it was based on suspicion of drug use.  Through this effort, Florida gathered evidence on the scope of this problem and the efficacy of the proposed solution.  The results debunked the assumptions of the State, and likely many laypersons, regarding TANF applicants and drug use.  The State nevertheless enacted Section 414.0652, without any concrete evidence of a special need to do so—at least not that has been proffered on this record.

The constitutional rights of a class of citizens are at stake, and the Constitution dictates that the needs asserted to justify subverting those rights must be special, as the case law defines that term, in order for this exception to the Fourth Amendment to apply.  Ferguson, 532 U.S. at 81.  That showing has not been made on this record.

 As the State has failed to demonstrate a special need for its suspicionless drug testing statute, the Court finds no need to engage in the balancing analysis—evaluating the State's interest in conducting the drug tests and the privacy interests of TANF applicants.

**ACCORDINGLY**, the Court finds that Plaintiff has shown a substantial likelihood of success on the merits of this action.

### b.     Irreparable Harm

The Court also finds that Plaintiff has demonstrated that he will suffer irreparable harm in the absence of preliminary injunctive relief.   The right to be free from

---

[10] Chandler, 520 U.S. at 324 (1997) (Rehquist, J., dissenting) (quoting New State Ice Co. v. Liebmann,

unreasonable searches and seizures under the Fourth Amendment is a fundamental constitutional right, the violation of which is enough to demonstrate irreparable harm. Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992).  A number of courts have found irreparable harm would flow from subjecting an individual to suspicionless drug testing. See, e.g., Am. Fed'n of Teachers-West Va., AFL-CIO v. Kanawha Cnty. Bd. of Educ., 592 F. Supp. 2d 883 (S.D.W. Va. 2009); Bannister v. Bd. of Cnty. Comm'rs of Leavenworth Cnty., Kan., 829 F. Supp. 1249 (D. Kan. 1993); Marchwinski, 113 F. Supp. 2d 1134 (E.D. Mich. 2000).

Subjecting Plaintiff, as well as those individuals who are similarly situated, to suspicionless drug testing as a condition of applying for TANF benefits would cause irreparable harm.  See Bourgeois v. Peters, 387 F.3d 1303, 1324 (11th Cir. 2004) (reversing denial of injunctive relief where city imposed an unconstitutional condition requiring the surrender of Fourth Amendment right to be free of unreasonable searches and seizures in order to participate in a protest); Chu Drua Cha v. Noot, 696 F.2d 594, 599 (8th Cir. 1982) ("We have no doubt that irreparable harm is occurring to the plaintiff class as each month passes" without the statutorily conferred level of welfare benefits.).

### c.    Balance of Harms and Public Interest

When a state is a party, the third and fourth considerations in granting a preliminary injunction are largely the same.  Scott v. Roberts, 612 F.3d 1279, 1290 (11th Cir. 2010) (citing Garcia-Mir v. Meese, 781 F.2d 1450, 1455 (11th Cir. 1986)).

285 U.S. 262, 311 (1932)).

The State has operated TANF without drug testing since 1996, and preliminary injunctive relief would merely require the State revert to the *status quo ante* until there is a final adjudication of the rights afforded its citizens under the United States Constitution.

Conversely, imposing an injunction would serve the public interest by protecting TANF applicants from the harm caused by infringement of their constitutional right, a right here that once infringed cannot be restored.  "Perhaps no greater public interest exists than protecting a citizen's rights under the constitution."  <u>Marchwinski</u>, 113 F. Supp. 2d at 1144 (quoting <u>Legal Aid Soc. of Haw. v. Legal Servs. Corp.</u>, 961 F. Supp. 1402, 1418 (D. Hawaii 1997)).   Accordingly, the Court concludes that preliminarily enjoining what appears likely to be deemed to be an unconstitutional intrusion on the Fourth Amendment rights of TANF applicants serves the public interest and outweighs whatever minimal harm a preliminary injunction might visit upon the State.

## III.   CONCLUSION

Based on the foregoing, Plaintiff's Motion for Preliminary Injunction is **GRANTED**. It is therefore **ORDERED** that the State is hereby **ENJOINED** from requiring Plaintiff to submit to a suspicionless drug test pursuant to Section 414.0652, Florida Statutes, as a condition for receipt of TANF benefits until this case is finally resolved on the merits. This Order does not address whether Florida is authorized to conduct drug testing of TANF applicants based on some quantum of individualized suspicion, an issue not before the Court.

It is further **ORDERED** that Plaintiff's unopposed request that he not be required to post the security that is typically required for the issuance of a preliminary injunction under Rule 65(c) of the Federal Rules of Civil Procedure is **GRANTED**.  See, Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009); All States Humane Game Fowl Org., Inc. v. City of Jacksonville, Fla., No. 3:08-cv-312-J-33MCR, 2008 WL 2949442, at *13 (M.D. Fla. July 29, 2008).

Upon the stipulation of the State that it "will apply such a ruling to all persons similarly situated to Plaintiff," the Court finds that class certification is unnecessary. (Dkt. 30 at 4)  Plaintiff's Motion for Class Certification is, accordingly, **DENIED without prejudice.**

**DONE** and **ORDERED** in Orlando, Florida, this 24th day of October 2011.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record