### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

LUIS W. LEBRON,
Individually and as Class Representative,

      Plaintiff,

vs.                                    Case No. 6:11-cv-01473-MSS-DAB

                                         **[DISPOSITIVE MOTION]**

DAVID E. WILKINS, in his official
capacity as Secretary of the Florida
Department of Children & Families,

      Defendant.
_____/

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
### SUPPORTING MEMORANDUM OF LAW

      Plaintiff LUIS W. LEBRON, individually and as Class Representative, and all class

members ("Plaintiffs"), respectfully move for summary judgment pursuant to Fed. R. Civ. P. 56,

Local Rule 3.01, M.D. Fla., and this Court's Scheduling Order, Dkt.60 at 6-7, and Dkt. 73.

### I.     PLAINTIFFS' STATEMENT OF MATERIAL FACTS[1]

#### A. Introduction

      By this action, Plaintiffs challenge Fla. Stat. §414.0652 (2011), which, as of July 1, 2011,

required all applicants for Temporary Assistance to Needy Families ("TANF") to submit to, pay

for, and pass a urinalysis drug test in order to be deemed eligible for Temporary Cash Assistance

("TCA"), without any individualized suspicion that they used illegal drugs or abused lawful

prescription drugs.  *See* Dkts.1, 2.  Plaintiffs assert that the mandated, suspicionless testing

violates the Fourth and Fourteenth Amendments' prohibition of unreasonable searches and

---

[1] The Parties have filed a Statement of Stipulated Facts as required by this Court's Scheduling
Order, Dkt.60.  Dkt.77 refers to that Stipulation.

seizures.  Following a three-hour evidentiary hearing, this Court entered a Preliminary Injunction on October 24, 2011.  Dkt.33.  The Plaintiff class was certified on December 7, 2012.[2]  Ten months ago, this Court found that Plaintiff was likely to succeed on the merits of his Fourth Amendment claim, as "the State has not demonstrated a substantial special need to justify its wholesale, suspicionless drug testing of all applicants for TANF benefits."  Dkt.33 at 23. Despite the State's subsequent attempt to bolster its case through discovery, that finding remains true today.  The Department of Children and Families ("DCF", or, "the agency") cannot demonstrate a special need, simply because there is none.

The evidence does not support the State's suggestion that TANF applicants engage in unlawful drug use at a higher rate than others, thereby creating a special need justifying an otherwise unlawful search.  The final results of the drug tests conducted pursuant to  §414.0652 reveal that only **2.6%** of those who were tested between July 1 and October 24, 2011, tested positive for drugs.[3]  Dkt.77 at ¶24; Ex.54.

In light of those results, *and* the results of the 1999-2001 DCF-commissioned Demonstration Project, *see* Dkt.32-1, DCF has been forced to rely on outdated, inapposite research studies in a vain attempt to support its argument that drug use and abuse is rampant among TANF applicants in Florida.  Alternatively, DCF strains, long after the legislation was passed, to identify a new special need based on something other than (unsubstantiated) high rates of unlawful drug use among TANF applicants.  To this end, DCF retained two unqualified and

---

[2]   DCF dismantled its statewide drug testing program on the evening of October 24, 2011. Dkt.38-1.  On November 3, 2011, the agency appealed the Preliminary Injunction.  Dkt.36. Briefing is complete in the Eleventh Circuit (Appeal No. 11-15258), and oral argument is scheduled in Atlanta for November 1, 2012.  Notably, the agency did not seek to expedite the appeal or to stay proceedings in this Court.
[3]   This is not materially different from the 2% figure this court relied on in preliminarily enjoining the policy. Dkt.33 at 12.

unreliable "experts," who know nothing about TANF applicants or recipients, whether in Florida or elsewhere, and who reached their opinions largely through run-of-the-mill Internet searches. *See* Dkt.70 (Second Motion in Limine re: D. Mark Wilson); Dkt.71 (Motion in Limine re: Avram Mack, M.D.).

Plaintiffs' position remains clear: Fla. Stat. §414.0652 is facially unconstitutional.  But, illustrating the operation of the facially unconstitutional statute, Plaintiffs now set forth facts brought to light during discovery.  The statute's requirement of a modicum of "dignity," *see id.* at (2)(f); and its assurances of privacy and confidentiality,[4] are illusory: in implementing the now-enjoined drug testing program, DCF showed little concern for the individual privacy rights that the Fourth Amendment is intended to protect, thus factually confirming the intrusive nature of the agency's drug testing program.  In point, thousands of documents and emails produced by the agency[5] reveal a chaotic four-month scramble to implement the new law—a debacle that included spotty compliance with the DCF-mandated testing protocol by agency-approved labs;

---

[4]   Section 414.0652 required that "[t]he department shall require a drug test consistent with s. 112.0455 to screen each individual who applies for Temporary Assistance for Needy Families (TANF) . . . ."  Section 112.0455 is Florida's "Drug Free Workplace Act," which requires, *inter alia*, stringent confidentiality in the drug testing process and detailed consent forms.  Regardless of how seamlessly the agency could have implemented the drug testing, and even if it had preserved applicants' privacy and confidentiality, the statute nevertheless would remain facially unconstitutional.

[5]   For summary judgment purposes, this Court may properly consider emails produced by Defendant during discovery, because they would be admissible at trial as (a) admissions by a party; or (b) as business records pursuant to Fed. R. Evid. 803(6); and (c) can be authenticated through the testimony of their authors.  *See*, *e.g*., *McMillan v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (otherwise admissible evidence may be submitted in an inadmissible form at the summary judgment stage, although at trial it must be submitted in admissible form); *U.S. ex rel. WFI Ga*., *Inc.*, 701 F. Supp.2d 1320, 1332-33 (N.D. Ga. 2010) (emails produced during discovery process admissible at summary judgment; emails likely to be business records and could easily be authenticated), *aff'd sub nom  U.S. ex rel. Capital Computer Grp*, 453 F. App'x 905 (11th Cir. 2010); *Sklar v. Clough*, 2007 WL 2049896 *4 (N.D. Ga. 2007) (emails offered in summary judgment deemed authentic when offered by a party opponent).

failure to provide approved testing sites in numerous counties around the State[6]; erroneous disclosure of applicants' test results and identifying information; and inappropriate reporting of parents to the statewide Child Abuse Hotline.

The State's disregard for privacy rights is perhaps best illustrated by DCF's response to its employees' request for an exemption from urinalysis testing for individuals with kidney failure, who were on dialysis and therefore could not produce a urine sample. Shockingly, rather than grant the exemption, the agency instructed its employees to have the labs collect the applicants' specimen using a urinary catheter.[7]

Ultimately, after four months of testing, DCF restored hundreds of thousands of dollars in TCA benefits to approximately 1,727 families, and reimbursed TANF applicants a total of $100,529.95 for the cost of their drug tests.[8]  As it turns out, the State's short-lived political experiment with Floridians' Fourth Amendment rights was nothing more than an unconstitutional and costly solution in search of a non-existent problem.

**B.  Background of HB 353**

HB 353 was filed on January 21, 2011.  As filed, the bill intended to create a new section, Fla. Stat. §414.0652, mandating that all TANF applicants consent to a drug test, but requiring only applicants who had "been convicted of a drug felony within the prior 3 years" to actually *undergo* the testing.  Ex.1.  However, Governor Scott, who had made a campaign promise to drug test welfare applicants, *see* Ex.2, proposed a different bill, which required universal drug testing of all applicants for TANF and the Supplemental Nutrition Assistance Program ("SNAP,"

---

[6]  Three counties (Glades, Hamilton, and Madison) were without a single lab for the entire month of September 2011, as well as considerable portions of other months.  Dkt.77 at ¶21.
[7]  *Infra* at 18.
[8]  *Infra* at 20.

formerly known as food stamps), including any parent or caretaker in a household receiving assistance. Ex.3.

Ironically, Governor Scott's version sought to amend Fla. Stat. §414.70 (1998) (repealed 2004), *see* Ex.3 at 3196, by which the Florida Legislature had directed DCF to conduct the aforementioned "Demonstration Project" to determine the extent of drug use among TANF applicants, and to assess the relative utility of inserting a drug testing requirement into the TANF application process.   The results of the Demonstration Project were captured in a subsequent study, which the State first ignored, *see* Dkt.33 at 25-26, and now attempts to discredit.[9]   Despite the clear results of DCF's Demonstration Project, HB 353 was modified eventually to mirror the Governor's version, which required universal drug testing of all TANF applicants.[10]

### 1.  DCF's Staff Analyses and Economic Impact Statements

DCF itself questioned the notion that the drug testing law was filed in response to a purportedly high rate of drug abuse among potential TANF applicants.   In a draft memorandum, entitled "Staff Analysis and Economic Impact," dated February 2, 2011, a DCF analyst wrote that State officials in Florida have been advocating for over a decade "to require drug testing of welfare recipients as a condition of eligibility for the receipt of TCA under the TANF program." Ex.4 at 1.   But in response to the draft memorandum, DCF's Director of ACCESS[11] Florida wrote:

---

[9]   Plaintiffs address findings of the study, conducted by Robert E. Crew, and Belinda Creel Davis, *infra* at 9-12.   Crew and Davis first submitted an "Evaluation Report" to the Legislature, Dkt.32-1; their published article appears as Dkt.22-2.

[10]   *See* Florida House of Representatives, *CS/CS/CS/CS/HB 353 - Drug Screening of Potential and Exisiting [sic.] Beneficiaries of Temporary Assistance for Needy Families,* http://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?BillId=45214 (last visited September 5, 2012).

[11]   ACCESS is the program office of DCF that oversees the TANF, SNAP, and Medicaid programs.   Dkt.77 at ¶1.

> We should not lead in section II on page one with a statement about a decade long push to require drug testing.  **Especially when Florida did a pilot program 10 or so years ago (at legislative direction) and the study of it said it was not cost effective so we stopped.  To me that means we have NOT been pushing for this**. ....

Ex.5 (bolding emphasis added).[12]   Hence, DCF was well aware of the prior study (the "pilot program"), as well as its conclusions.

In a February 8, 2011, memorandum entitled, "Staff Analysis and Economic Impact," a DCF employee warned of potential harms from HB 353, but was instructed to remove or rephrase the portions of the memo that questioned the wisdom of the policy:

> The proposed legislation requires applicants and recipients selected to undergo drug-screening to pay for the costs of the initial drug screening and confirmatory testing. The provisions of this bill do not allow applicants or recipients who fail a confirmatory test to participate in a publically-funded substance abuse treatment program as a condition to maintaining eligibility for or receipt of TCA. The aforementioned provisions could create barriers to achieving full economic self-sufficiency, impose additional financial obligations on those already experiencing economic hardships, and impede access to publically funded substance abuse treatment services. Rephrase or delete If eligibility for TCA benefits are denied for 3 years, without any opportunity to participate in substance abuse treatment services, there is little to no incentive for an individual to seek substance abuse treatment services and to improve his/her health, employability, and current economic situation. Rephrase or delete

Ex.6 at 3 (yellow and red highlighting appear in original).[13]

DCF analysts further predicted that requiring TANF applicants to pay for drug testing "may prohibit the individuals from applying" and, more alarmingly, warned that:

> Families unable to apply for benefits due to lack of funds to pay for drug testing could result in an increase of children "at risk" and possible placement in more expensive

---

[12]   DCF produced emails in their native format, most of which cannot be printed even in PDF format without cutting off portions of the text. The entire text is visible only after pasting it into a Word document. Accordingly, both the incomplete native text and the complete Word document, both bearing the same Bates number, are provided as exhibits.  This "dual-copy" mechanism was used when entering exhibits during depositions, with no objection from the State.  *See* Declaration of Maria Kayanan, Ex.A to Motion for Summary Judgment.

[13]   The highlighted sections of DCF's analysis reflect the instructions from the Governor's Office of Policy and Budget ("OPB") to "rephrase or delete" those sections.  The highlighted sections did not appear in any of the House or Senate Staff Analyses of HB 353.

emergency care, foster care, or Relative Caregiver placements. **TANF caseload data shows 91.1%, of all TANF assistance groups subject to drug testing under this bill have no income**.

Ex.7 at 3 (emphasis added).[14]

A DCF "Fiscal Note," dated March 7, 2011, revised the appropriations costs for HB 353 to $475,004 for the first year, and $465,498 for the second year, down from $2,081,653.00. Ex.8; Ex.4 at 7.  However, by March 28, 2011, the agency had received instructions from the Governor's Office of Policy and Budget that "the committee staff at [HB 353's] next stop were [*sic.*] asking for a statement that the bill has no fiscal impact."  Ex.9.

Two days later, the DCF Committee Substitute Analysis for HB 353 informed the Legislature that "[i]t has been determined that the Department can adsorb [*sic.*] the additional workload within existing appropriation."  Ex.10 at 8.  However, on April 14, 2011, the agency attempted to estimate how much it would cost the State to reimburse applicants for negative tests.  The estimate was $621,000, and projected a "failure rate" of 7.2%."  Ex.11.

On June 1, 2011, one month before the law was to take effect, a DCF analyst reiterated that drug testing could delay the application approval process, as applicants may not immediately have the money to pay for the tests, and again, that the drug testing requirement might deter individuals from applying for benefits altogether.   Ex.12 at 2; Ex.7 at 3.   None of DCF's

---

[14]   Analysts also unsuccessfully recommended that, if enacted, the drug testing requirement not take effect until January 1, 2012, to allow time to make programming changes to the computer database and to develop "secure electronic methods for communication of drug testing results." *Id.* at 5.  That recommendation was ignored, and the law took effect on July 1, 2011.  The "communication of drug testing results" is set forth in detail, *infra* at 17-18.

warnings about the dangers HB 353 posed to children or families made it into the House or Senate Staff Analyses.[15, 16]

### 2. House and Senate Staff Analyses of HB 353

The House Staff Analyses alerted members of the House of Representatives that in *Chandler v. Miller*, 520 U.S. 305 (1997), the Court struck down a Georgia statute requiring candidates for public office to certify that they had taken and passed a drug test. The Staff Analyses also correctly pointed out that a Michigan district court had found a law similar to HB 353 "an unconstitutional violation of an individual's right to privacy under the Fourth Amendment." Dkt.22-4 at 4 (citing *Marchwinski v. Howard*, 113 F. Supp. 2d 1134 (E.D. Mich. 2000), *aff'd by evenly divided en banc court*, 60 Fed. Appx. 601 (6th Cir. 2003). The House Staff Analyses correctly cited *Marchwinski* as having been affirmed by an evenly divided Sixth Circuit *en banc* court.

By contrast, the Senate Staff Analyses all mischaracterized the disposition of the case, and advised the Senate that the Sixth Circuit had reversed the district court and held that the

---

[15]   *See*   http://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?BillId=45214   (HB   353); http://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?BillId=45266&   (SB   556)   (last   visited September 5, 2012).

[16]   Legislators' comments on the bill revealed their apparent preconceptions about welfare applicants. Rep. Smith, who sponsored HB 353, issued a press release on April 26, 2011, that included the following quote attributed to him: "By promoting personal responsibility and providing a protective payee for children, this legislation will protect disadvantaged children while ensuring taxpayer dollars are spent appropriately. Temporary Assistance for Needy Families should be used as a hand up, not a handout. I am proud to offer legislation that ensures government assistance will be used for its intended purpose." Ex.13. Rep. Drake issued a press release that quoted him as follows: "When folks are receiving assistance on your dime and my dime and they're using the money to go smoke doobies or get doped up or take crack then that demonstrates to me that they don't want to help themselves." Ex.14. Rep. Kreegel was quoted as saying: "To be giving these people $300 a month when they have a $25 a day crack habit, the money is not going to get to the family. We're doing nothing but pouring gasoline on an already existing fire." Ex.15 (highlighting added). Rep. Baxley was quoted as saying "We are becoming enablers and participants in this sick little relationship about substance abuse." *Id.*

statute was constitutional.[17]   All Staff Analyses, in both chambers of the Legislature, *see* n.15,

s*upra*, included a summary of results from the State-commissioned Demonstration Project (or

"pilot project").   The House and Senate[18] analyses described the project's findings as follows:

> From January 1999 to May 2001, DCF, in consultation with Workforce Florida,
> implemented a pilot project in Regions 3 and 8 to drug screen and drug test applicants
> for TANF. [8] A Florida State University researcher under contract to evaluate the pilot
> program did not recommend continuation or statewide expansion of the project.
> Overall research and findings concluded that there is very little difference in
> employment and earnings between those who test positive versus those who test
> negative.   Researchers concluded that the cost of the pilot program was not warranted.

Dkt.22-4 at 3; Dkt.22-5 at 3.[19]

### 3.   The 1999-2001 Demonstration Project

The Demonstration Project referenced in the staff analyses arose from 1998 legislation,

by which Florida lawmakers required DCF to:

> [D]evelop and, as soon as possible after January 1, 1999, implement a Demonstration
> Project in WAGES regions 3 and 8[20] to screen each applicant and test applicants for
> temporary cash assistance provided under this chapter, who the department has
> reasonable cause to believe, based on the screening, engage in illegal use of controlled
> substances.   Unless reauthorized by the Legislature, this Demonstration Project expires
> June 30, 2001.

Fla. Stat. §414.70(1) (Ch. 98-397).[21]

---

[17]   *See*  n.15, *supra*.

[18]   The Senate Companion bill to HB 353 was SB 556.   The House passed HB 353 on April 26, which was then sent in messages to the Senate.   The Senate passed the bill on May 5. 2011. Dkt.77 at ¶12.

[19]   Note [8] in the analysis referred to the "Evaluation Report, by Robert E. Crew, Florida State University, (on file with committee staff)."   The Report appears as Dkt.32-1.

[20]   Region 3 consisted of Calhoun, Holmes, Jackson, Liberty, and Washington Counties; Region 8 consisted of Clay, Duval, Nassau, Putnam, Baker, and St. John's Counties.   Ex.16 at 1.   The Demonstration Project drug testing scheme applied to individuals in those counties who applied for TCA on or after January 4, 1999.   *Id*. at 2.

[21]   In a "Meeting Summary," dated November 19, 1998, the agency's working group charged with implementing the drug testing provisions of Ch. 98-397 memorialized its decision to use the Substance Abuse Subtle Screening Inventory ("SASSI") as an initial, written screening tool to determine which applicants to test.   Ex.17 at 2408.   Plaintiffs do not suggest that the

The agency contracted with Florida State University ("FSU") to implement the Demonstration Project from April 21, 1999, through January 31, 2001, for a fee of $65,876.00. Dr. Robert Crew, Associate Dean of the College of Social Sciences at FSU, was the project director. Ex.18. The cost of the entire project, including the tests themselves, staff time, and other related expenses, came to more than $600,000. Dkt.32-1 at ii.[22]

During the 21-month Demonstration Project, a total of 8,797 individuals underwent the preliminary "SASSI" screening; 2,335 did not complete the application process. Dkt.22-2 at ¶12. Crew, and his research partner Belinda Creel Davis, noted that "[t]his percentage (26.5%) of applicants who were 'non-application completers' and who did not ultimately receive benefits is in line with the historical data on 'non-application completers.'" *Id*. The researchers found that only 5% of the pool of tested applicants tested positively on the urinalysis (compared to the 2.6% who tested positive *statewide* in 2011), and concluded as follows:

> This evaluation was able to provide reliable information upon which conclusions can be drawn relative to the 5% who tested positively on the urinalysis versus those who did not regarding the relationships between substance abuse and employability and between substance abuse and use of TANF benefits. **This is an important issue and the analysis suggests that individuals who screen and test positively for substance abuse are just as likely to work as are those who screen and test negatively.**

*Id*. at 31 (emphasis added).

The authors further concluded that "[t]hose individuals who test positively also earn approximately the same amount of money and utilize food stamps, Medicaid and cash assistance at about the same rates as do those who test negatively." *Id*. This Florida-commissioned report

---

Demonstration Project's testing scheme was permissible under the Fourth Amendment, but discuss it only to describe accurately the State's prior experiment.

[22] One Senate staff analysis reported that the total cost of the Demonstration Project was closer to $2.7 million. Dkt.22-5 at 7. In any event, the project was, by all accounts, a costly undertaking.

was the sole Florida TANF drug testing data that was before the Legislature when it considered

HB 353 in 2011.  The published study that emerged from the report reiterated the validity of the

data:

> Evidence from the Florida Demonstration Project showed very little difference between drug users and non-users on a variety of dimensions.  Users were employed at about the same rate as were non-users, earned approximately the same amount of money as those who were drug free and did not require substantially different levels of governmental assistance.  If there are no behavioral differences between drug users and non-users and if drug users do not require the expenditure of additional public funds, then policymakers are free to concentrate on other elements of welfare policy and to avoid divisive, philosophy-laden debates.

Dkt.22-2 at 13 (Robert E. Crew, Jr. & Belinda Creel Davis, *Assessing the Effects of Substance Abuse Among Applicants for TANF*, 17(1) J. HEALTH & SOC. POL'Y 39, 52 (2003)).  Consistent

with the conclusions offered by Crew and Davis, this Court, in considering Plaintiffs' motion for

preliminary injunction, analyzed the Evaluation Report in depth and found as follows:

> Notwithstanding the concerns surrounding the methods employed, the concrete scientific evidence gathered clearly undermined the underlying assumption regarding the prevalence of substance abuse among TANF applicants: drug use among the tested TANF population was found to be significantly lower than drug use among welfare recipients in other national studies.  The results also showed significantly lower rates of drug use among this population than the rate of drug use among the population of Florida at large, which was recently estimated at 8.13 percent.

Dkt.33 at 6 (citations omitted).

But when considering HB 353, the Florida Legislature ignored the results of the Crew

and Davis study.  Nor did lawmakers consider the various legislative analyses correctly pointing

out that the Demonstration Project—that the Legislature itself had mandated—indicated little

difference in employment and earnings between those who tested positive and those who tested

negative, and that the cost of such a program was not warranted.  In email correspondence dated

October 25, 2011, one day after this Court entered the Preliminary Injunction, a DCF analyst

expressed surprise that this Court had so carefully analyzed the Demonstration Project in the Preliminary Injunction, given the Legislature's failure to do so:

> I read the whole thing, and I was impressed with the [Court's] findings.  **I was also astonished at how much she cited the old demonstration when we could never get anyone to give it credence during the session.**

Ex.19 (emphasis added).

After the Demonstration Project was completed, "the legislature decided not to spend any further time or funding on this issue," and "[t]here was no subsequent evaluation commissioned by the Department . . . ."  Ex.20.  The Crew and Davis study thus remains the most recent and, as the only known Florida-based study, the most relevant source of data regarding drug use or abuse among TANF applicants in Florida, *see* Dkt.33 at 24-25, and whether such use or abuse has any correlation to those individuals' ability to find and retain employment.

### 4.  The Drug Testing Scheme's Tenuous Link to Child Welfare

Because DCF reported positive test results to the Florida Abuse Hotline, that information is accessible to law enforcement, notwithstanding DCF's practice *not* to treat every instance of parental drug use or substance abuse as the equivalent of child abuse or neglect.  As Mike Carroll, a seasoned DCF Regional Managing Director, who oversees child welfare in 11 Florida counties acknowledged, not every parent who is a substance user or abuser has their children removed from the house, and a single drug test doesn't reveal whether a parent is abusing or is dependent upon prescription drugs, illegal drugs, or alcohol.  Ex.21 at 24, 77:6-10, 79:6-13.

Further, not every parent or custodian investigated by Child Protective Safety is required to be drug tested.  *Id.* at 61-62.  In fact, before HB 353 was passed, allegations of parental drug use were screened by DCF's Family Safety Office on a case by case basis. As one Family Safety Program Office Deputy wrote in May 2011:

**Florida has no laws that state illegal drug use, in and of itself, is presumed harm to children**, so an investigation is required to determine when someone calls it in.  Also there has been some expressed concern from poor people and legislators representing them.... I think this is a very big policy decision and we need to thread the needle of protecting children but not over-reacting to a positive drug screen and removing children needlessly.

Ex.22 (emphasis added).

Although the text of HB 353 did not require positive drug test results to be reported to the statewide Child Abuse Hotline, in early June 2011, DCF's Family Safety Program Office nevertheless decided to implement a policy requiring DCF to do just that.  Ex.23.  The DCF Northeast Region Director responded with apparent dismay:

Oh my, do these really have to go to the hotline?  Does every doctor who tests a patient have to report a positive, if they have kids?  Or, cops with DUI?  Many people have prescriptions.  I really recommend we do not handle these.

Ex.24.  *See also* Ex. 25 ("How are we handling the fact that ACCESS will have no alleged abuse or neglect info to report?  . . ."); Ex. 26 ("**Although these reports will not have allegations of adverse affects** [*sic*.] **to the child(ren)**, the Hotline will look at priors, type of drug, and consider the fact that this is a positive drug test which increases the concern as other reports are generally someone else's account of the parent/caregiver's use of drugs.") (emphasis added).

Florida's Children First, a child welfare advocacy group established by leaders of The Florida Bar Foundation, wrote DCF a letter containing the following:

When the Department tells TCA applicants that drug test results will be shared with the Abuse Hotline you are telling them that by applying for benefits they will risk losing their children.  The common understanding of a report to the Abuse Hotline is that you are being accused of child abuse or neglect, you will be investigated and your child may be removed.

Ex.27 at 1.

The group also cautioned DCF that the referrals would unnecessarily divert already stretched DCF resources from children and families in real need, and that "the presence of a CPI

following up on a drug test will validate community concerns that the state wants to take children away from TCA applicants."  *Id.* at 2.  And, after the injunction was entered, a child welfare advocate advised DCF that "**a positive test says nothing about the degree of impairment and the relationship between a parent's use and their ability to care for their children.**"  Ex.28 (emphasis added).

DCF's reporting is no small matter and can result in parents being subjected to invasive and unwarranted scrutiny from State officials.  *See* Ex.29.  For instance, among those applicants who were reported to the Abuse Hotline is a woman who tested positive after taking her legally prescribed medication.  As a result of the referral to the Abuse Hotline, a Parent in Need of Assistance ("PNA") investigation was launched and the applicant was investigated by Child Welfare.  After visiting the applicant's home and counting her pills, Child Welfare officials determined that:

> Mother recently had a major surgery and has many complications requiring additional hospitalizations.  Mother was able to provide actual prescriptions as well as the reocrds [*sic.*] for all prescriptions since the surgery.  The prescriptions were counted and were on target with what is prescribed.  The mtoher's [*sic.*] current prescription does have codeine in it which is what she tested positive for.  No services are needed and mother declined any services.

Ex.30 (also reflecting that investigations reached into children's schools and day care centers).

In March 2012, the agency implemented Fla. Admin. Code 65A-4.221 (2012), reversing the Hotline referral policy—four months after the Preliminary Injunction was entered and the testing had been stopped.[23]  Indeed, the change in policy is directly attributable to this Court's Preliminary Injunction.  *See* Ex.31 at 3-4.  But, the damage had already been done: reports to the statewide Abuse Hotline remain in the database, *see* Ex.21 at 103 (and Court Reporter's

---

[23]  The rule provides, in part, that "[p]ositive drug test results obtained by the Department pursuant to Section 414.0652, F.S., **will not be reported to the Florida Abuse Hotline** or to law enforcement entities or officers."  (emphasis added).

Corrections Certificate Cover Sheet), and therefore remain accessible to law enforcement indefinitely.  *See also* Dkt.33 at 11, citing Fla. Stat. §39.202(2)(b)-(c).

As an additional example of the statute's harmful effect on families, an individual's positive test meant his *family* would lose the funds attributable to him: for a family of 2, the monthly TCA allotment would drop from $241 to $180.  Ex.21 at 96:1-22.  Any adult who tested positive would also have "curtailed" levels of access to TANF-related job support systems such as transportation, job training, professional skills building, and childcare.  *Id.* at 80:10-23, 97:8-13.[24]

### 5. The Drug Testing Program Was Poorly Implemented, Making it Difficult for TANF Applicants to Comply with Program Requirements

Following months of planning, which included coordinating DCF-approved drug testing sites, drafting new application and acknowledgment forms, reconfiguring its online application and processing protocols, and training thousands of DCF workers across the State, drug testing began on July 1, 2011.[25]  Ex.32.[26]  In light of the complicated procedures associated with program implementation, additional training was provided to State employees in August and

---

[24]  Tellingly, although section 414.0652 disqualified from TCA eligibility individuals who tested positive, individuals receiving TCA while undergoing substance abuse treatment do not lose those benefits. Ex.21 at 57:6-15.  *See also* Ex.56 at 42:3-43:5.

[25]  Although section 414.0652(4) directed DCF to "adopt rules to implement this section," the only rule that DCF implemented was Fla. Admin. Code 65A-4.221 (2012), reversing the Hotline referral policy.

[26]  Ex. 32 consists of DCF's training "Questions and Answers" that describe, overall, the agency's implementation of the drug testing program.  Oddly, as part of the training, under DCF's interpretation of section 414.0652, DCF employees were advised that TANF applicants who tested positive, but for whom substance abuse treatment was deemed not necessary by a substance abuse professional, were nevertheless ineligible for TCA until they successfully completed a hypothetical custom-designed treatment program for individuals who need "little or no ongoing treatment"—treatment which they did not need in the first place.  Ex.32 at 1625 (Question No. 44).

September 2011.  Ex.32 at 1648, 1652; Ex.33.[27]  Despite the supplemental training, the State was compelled to develop a Quality Control Mechanism, which was put in place in August 2011, to address widespread error rates.  Ex.35 at 102-106; *see also*, *e.g.*, Ex.36.[28]

During the four-month period of implementation, DCF failed to identify and/or maintain labs that used the appropriate protocols on a consistent basis.  In fact, on the very eve of the program start date, the "big labs . . . pulled out" for lack of a contract.  Ex.37.  Some sites operated by the two biggest participating labs, LabCorp and Quest, initially insisted that TANF applicants provide them with a "chain of custody" form, which had not been provided to any of the applicants.  Ex.38.  At least one Quest lab was listed as an approved site, but when an applicant prepaid for her test and showed up at the appointed time, the lab told her that it "wasn't ready to give tests yet."  Ex.39.[29]  A Workforce[30] entity prematurely directed applicants to be tested, before their initial eligibility had been determined: some applicants thus paid for drug testing even though they were ultimately found ineligible for reasons unrelated to drug testing.  Ex.40.  Some labs required prepayment online, even though some TCA applicants do not own a credit card.  Ex.41.  Trying to find and maintain labs, and ensure proper protocols, was a full-time job.  Ex.42 at 111-125 (and Ex.16 to Cece deposition).

Many counties were without labs at various times. Dkt.77 at ¶21.  Applicants in Monroe County were without *any* lab for a total of thirty-seven days, and until then were directed to the

---

[27]  The only instance where more training was deemed *not* necessary was when DCF anticipated the injunction; one DCF employee relayed, "I think getting them to stop [testing] will be easier that it has getting them to do it right," and another, that "I agree that mandatory training is not needed because staff will be happy to stop this."  Ex.34.

[28]  This document, when produced, included the applicants' names, which Plaintiffs' counsel redacted.

[29]  This email, when produced, included the applicant's phone number, which Plaintiffs' counsel redacted.

[30]  *See* Dkt. 77 at ¶8.

closest clinic "south of Miami." *Id*.; Ex.43.  Three counties lacked any lab for the entire month

of September.  Dkt.77 at ¶21.  If an applicant lived in a county that lacked an approved testing

site, no DCF funds were available for transportation to a neighboring county.  Ex.44; Ex. 21 at

94:21-95:7.

### 6. The Drug Testing Program Delayed Approvals, Breached Medical Confidentiality, and Violated Individuals' Privacy

To make matters worse, the agency breached confidentiality on a number of occasions

and demonstrated little concern for applicants' privacy.  For instance, DCF-approved labs didn't

route results of the drug tests to the proper DCF location within the ten-day window the agency

provided to applicants; LabCorp collected urine specimens in Florida, but the specimens were

analyzed in North Carolina, and the company's Medical Review Officer was based in New York

State.  Ex.45.[31]  Some labs refused to divulge the results to anyone other than the "donor," Ex.46,

and then faxed them to the wrong locations.  Ex.47.[32]  One regional office was described as

"swamped" with "hundreds and even thousands of pages" of faxes containing drug test results,

Ex.48, which are confidential under Fla. Stat. §112.0455.[33]  The misdirected results bogged

down the application process.  Ex.47 at 000882, 884.  Results were entered under the wrong

applicant's name, and, in at least one instance, under a child's name.  *Id*. at 85.

When DCF transitioned to having the lab results emailed to DCF employees rather than

faxed to them, the agency instructed the testing companies to include in the email the applicant's

name, date of birth, Social Security number, and county of residence.  Ex.49.  In late September,

---

[31] Plaintiffs' counsel redacted the individual's name and apparent Social Security number on DCF013161.

[32] Plaintiffs' counsel redacted the individual's name on DCF011950 and Lebron-000887.

[33] *See* n.4, *supra*.

a DCF worker found a pile of nine unrelated lab results in a case file.  Ex.50.  Each of the results included the TANF applicant's name, and sometimes his or her Social Security number.[34]

On another occasion, a representative from a DCF-approved lab showed up, unannounced, at an applicant's home to collect a urine specimen from her.  Upon arrival, the lab official directed the applicant to the bathroom to complete the test, even though it meant leaving her children alone with him while she provided the sample.  Ex.51.[35]  And, for TANF applicants suffering from kidney failure, who were on dialysis and could not produce a urine sample, the testing procedure became even more intrusive.  The only option available to them was to provide a sample through a urinary catheter.  When a DCF ACCESS "Program Specialist" requested an exemption for the dialysis patient, DCF officials told them that there were no "good cause" exemptions, and that the lab should note that the specimen was "retrieved from catheter," thereby explaining why the specimen was "outside of the temperature range."  Ex.52 at 15971.[36]

### C.  Plaintiff Luis Lebron

Mr. Lebron, a single father of a now-six-year-old son, and an honorably discharged U.S. Navy veteran, continuously received TCA since the Preliminary Injunction was entered until August 31, 2012, and remained continuously eligible.  Dkt.2-1 at ¶8; Dkt.77 at ¶¶27-30; Ex.53 at ¶4.  His nearly year-long search for employment was, until recently, unsuccessful.

Beginning August 20, 2012, however, Mr. Lebron became employed, on a contract employee basis, as an Associate Accountant at Walt Disney World in Orlando.  Dkt.77 at ¶38;

---

[34]  These results were also produced with the applicants' names and Social Security numbers. Plaintiffs' counsel redacted them.
[35]  Again, Plaintiffs' counsel redacted the applicant's name and partial Social Security number from the email produced.
[36]  The Program Specialist noted that "[t]here may be some controversy" over using a catheter. *Id.*

Ex. 53 at ¶¶7-9.[37]  Mr. Lebron's TCA benefits ended as of August 31, 2012.  Dkt.77 at ¶38.

Despite his current employment, Mr. Lebron wishes to remain Class Representative: while he

hopes never to "resort to TANF again to support [his] family," he will not hesitate to re-apply for

TCA benefits in the event that he loses his employment.  Ex.53 at ¶12; *see also* Dkt.77 at ¶39.

As such, he maintains a significant interest in ensuring that TANF applicants' constitutional

rights are protected.[38]

### D.  The Results of Florida's Four-Month Drug Testing Program

During the four months the drug testing program was in effect, 2.6%, or 108 applicants,

tested positive.  Dkt.77 at ¶24; Ex.54.  Of those 108 individuals, 44 tested positive for

cannabinoids (marijuana); 24 for benzodiazepines; 10 for cocaine; 9 each for barbiturates and

opiates; 10 for methadone; 3 for propoxyphene; 5 for amphetamines or methamphetamines; and

2 for PCP.  *Id.*

During those four months, employers who hired TANF recipients would not necessarily

have even known who had been tested: the TANF population included individuals who applied

before July 1, 2011, and were not subject to section 414.0652.  Ex. 21 at 103:17-04:7.  A District

Director of a Workforce program testified in her deposition that she did not know whether the

drug testing program had *any* effect, one way or another, on placing people into employment.

Ex.56 at 7:2-7, 27:12-29:19.

Although the class was not certified until December 7, 2011, DCF voluntarily ended the

testing program statewide on the evening of October 24, 2011, when the Preliminary Injunction

---

[37]  The outsourcing company that hired Mr. Lebron on behalf of Disney drug tests its employees under only the narrowest of circumstances: "when an on-the-job accident requiring medical attention occurs, as allowed by law."  Ex.55.  The company also pays for the testing.  *Id.*

[38]  The State, in opposing class certification, affirmatively argued that Mr. Lebron's claim was capable of repetition, yet evading review.  Dkt.42 at 1-2, 4-5.

issued.  Dkt.38-1.  The State then approved all applications that had been pended for drug testing, and even approved TCA benefits for individuals who had tested positive, notwithstanding their positive drug test results; overall, the State restored $594,918.00 in benefits to approximately 1,727 families.  Dkt.77 at ¶25; Ex.57. [39]

The TANF approval rate has been declining overall over the past few years.  Ex.58.  Fluctuations in the approval rates are attributable to many factors, and ultimately cannot be explained by any one phenomenon.  Ex.21 at 105-06; Ex.34 at 119-24; Ex.56 at 30-31.

## II.   PLAINTIFFS ARE ENTITLED TO FINAL SUMMARY JUDGMENT

### A.  Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.* v. Catrett, 477 U.S. 317, 322 (1986).  The moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting former Fed. R. Civ. P. 56(e)).  The nonmoving party cannot simply show "that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present evidentiary material in support of its position.  *Celotex Corp.*, 477 U.S. at 324.

---

[39]   DCF's counsel has admitted that Ex.57, which the State produced during discovery, is a public record; has disputed the accuracy of the numbers; but has provided no alternative figures.

**B.      The State's Mandated Urine Testing of TANF Applicants is an Unreasonable and Therefore Unconstitutional Search**

"There are few activities in our society more personal or private than the passing of urine."  *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 617 (1989).  The Supreme Court has held consistently and unequivocally that a compelled urinalysis is a search within the meaning of the Fourth Amendment.  This holds true for candidates running for public office, *see Chandler v. Miller*, 520 U.S. 305, 313 (1997); for obstetrical patients receiving care at a state hospital, *see Ferguson v. City of Charleston*; 532 U.S. 67, 76 (2001); for public employees, *see Skinner*, 489 U.S. at 617; for student athletes and student participants in competitive extracurricular activities, *see Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652, (2002); *Bd. of Educ. v. Earls*, 536 U.S. 822, 828 (2002).  *See also Wenzel v. Bankhead*, 351 F. Supp. 2d 1316, 1320 (N.D. Fla. 2004) (employees of the Florida Department of Juvenile Justice); *Baron v. City of Hollywood*, 93 F. Supp. 2d 1337, 1339 (S.D. Fla. 2000) (city job applicants as a condition of applying for employment).  TANF applicants are no different.[40]

The facts brought to light during discovery highlight the unreasonableness of the facially unconstitutional search required by section 414.0652.  When implementing section 414.0652, the State, and the labs that it had approved as testing sites, disregarded individuals' privacy and risked the inappropriate disclosure of sensitive medical and personal information.  Urinalysis results, which are confidential, were routed through scores of individuals via "thousands of pages" of faxes, then via email.  Test results – complete with names and Social Security numbers

---

[40]   In the context of a government mandated drug test, there are *two* searches that occur—the taking of the urine sample itself, as well as the subsequent chemical analysis of that sample.  *See Skinner*, 489 U.S. at 616-617.

– were misplaced, then found by a DCF worker in a pile inside an unrelated case file.  *Supra* at

17-18.

One applicant was "visited" by a lab representative in her home, and directed to fill the

sample cup in her bathroom while her children remained with the stranger.  *Id*. at 18.  No

exceptions were made for obtaining urine samples.  If an individual could not urinate due to

kidney failure, then the urine was to be obtained through a urinary catheter.  *Id.*  Positive results

were reported to the Child Abuse Hotline, and ensuing "Parent Needs Assistance" referrals and

investigations reached into children's schools and day care centers.  *Id*. at 14.

Although DCF reversed its position regarding reporting to the Abuse Hotline in direct

response to this Court's Preliminary Injunction, supra at 14, the reports remain in the system, *id*.,

and law enforcement is able to access the reports.  *Id*.; Dkt.46 at 55-56.[41]  These facts confirm,

indeed surpass, the concerns this Court voiced nearly one year ago:

> The intrusion here also extends well beyond the initial passing of urine.  Positive tests
> **are not kept confidential in the same manner as medical records; they are shared
> with third parties, including DCF, medical reviewers and counselors** for the Florida
> Abuse Hotline.  More troubling, **positive test results are memorialized, perhaps
> indefinitely**, in a database that the State admits can be accessed by law enforcement.

Dkt.33 at 17 (emphases added).

Even if section 414.0652 had been implemented without any of the administrative

debacles set forth above, and without the egregious privacy violations,[42] the scheme would

remain a violation of the Fourth and Fourteenth Amendments.  The State *cannot* maintain its

---

[41]   DCF counsel Drew Parker to the Court: "[t]o answer your question very directly, yes, there is
a database that's maintained by the Department, the Florida Safe Families Network, commonly
referred to as FSFN, and certain law enforcement agencies do have access to that system."

[42]   Compare *Am. Fed'n of State Cnty. & Mun. Emps. Council (AFSCME) v. Scott*, -- F. Supp. 2d -
-, 2012 WL 1449644, at n.1 (S.D. Fla. Apr. 26, 2012) (holding Executive Order unconstitutional;
under Gov. Scott's Executive Order relating to State employee drug testing, "the urinalyses
performed under the EO would be **discrete, private, and confidential**") (emphasis added).

untenable position that the urinalysis mandated by section 414.0652 is simply an administrative hurdle;[43] it is an invasive, investigatory mechanism repeatedly condemned by the Supreme Court as an unreasonable search, absent a showing of a special need.

### C.  The State Has Presented No Evidence Sufficient to Establish a Special Need

Whether a special need exists is a fact-specific inquiry.  *See Earls*, 536 U.S. at 830 (noting that to determine whether a "special needs" situation justifies a search without individualized suspicion, a court must undertake "a fact-specific balancing of the intrusion . . . against the promotion of legitimate governmental interests.") (citing *Vernonia*, 515 U.S. at 652-53).  In every Supreme Court case that has found a special need sufficient to overcome the Fourth Amendment's requirement of individualized suspicion, the finding of a special need was based on evidence, not on conjecture: the State must present evidence that, without the testing, there is a real threat of harm to a compelling government interest.

In *Earls*, depositions and testimony in the district court had demonstrated that "there was a history of drug abuse starting in 1970 that presented 'legitimate cause for concern.'"  536 U.S. at 827.  The record before the district court included evidence specific to Tecumseh High School students.  *Earls v. Bd. of Educ.*, 115 F. Supp. 2d 1281, 1285-86 (W.D. Okla. 2000) (footnotes omitted), *rev'd*, 242 F.3d 1264 (10th Cir. 2001), *rev'd*, 536 U.S. 822 (2002) (school board president and three teachers testified that they had heard students speaking openly about using drugs in recent years; two teachers testified that they had seen students who appeared to be under the influence of drugs; the two student Plaintiffs acknowledged there is some drug abuse by Tecumseh High School students; a drug dog found marijuana cigarettes near boundary of the

---

[43]  This Court has correctly held that *Wyman v. James*, 400 U.S. 309 (1971) does not control the Fourth Amendment analysis in this case. Dkt.33 at 15-18.

school parking lot, and alerted on a vehicle which contained particles and seeds of marijuana; police officers once found drugs or drug paraphernalia in a car driven by an FFA member).

The Court likewise decided *Vernonia* based on hard evidence, adduced at trial, replete with extensive witness testimony about student athlete drug use by Vernonia students, in its schools and sports programs.  *See Acton v. Vernonia Sch. Dist. 47J*, 796 F. Supp. 1354, 1356-58 (D. Or. 1992) (setting forth in detail the content of various witnesses' testimony), *rev'd*, 23 F.3d 1514 (9th Cir. 1994), *judgment vacated*, 515 U.S. 646 (1995).  *See also Ferguson*, 532 U.S. at 74 (setting forth facts established in jury trial); *Nat'l Treasury Emps. Union v. Von Raab*, 659 F. Supp. 380, 381 (E.D. La. 1986), *vacated*, 816 F.2d 170 (5th Cir. 1987), *judgment aff'd in part and vacated in part*, 489 U.S. 656 (1989) (undisputed facts were that customs agents routinely carry weapons and their job duties include drug interdiction); *Skinner*, 489 U.S. at 607 (summary judgment proceedings showed "at least 21 significant train accidents involving alcohol or drug use as a probable cause or contributing factor, resulting in 25 fatalities, 61 non-fatal injuries, and property damage estimated at $19 million," with "an additional 17 fatalities to operating employees working on or around rail rolling stock that involved alcohol or drugs as a contributing factor").  No similar compelling facts were before the Florida Legislature when it enacted section 414.0652, and none have been presented here by the State.

### 1. Florida's Drug Testing Scheme is Distinguishable From the Programs Upheld by the U.S. Supreme Court and is Analogous to the Program Struck Down in *Chandler v. Miller*

As demonstrated in Section I of this Motion, the evidence offered by the Defendant, both in quantity and in substance, falls far short of the standard set by the above cases.  *Vernonia* and *Earl*s, where the government was acting in the place of the parent or guardian, and had "custodial and tutelary responsibility" for school children, do not control here, for obvious

reasons.  To begin with, Mr. Lebron is not a child under the supervision of the State; he retains his undiminished constitutional rights and is not subject to the reduced expectation of privacy afforded to schoolchildren.

Further, by contrast to the facts in *Skinner*, *Von Raab*, *Vernonia*, and *Earls*, in *Chandler*, there was *no* evidence that elected officials in Georgia were drug users or abusers.  In concluding that no special need existed to justify the proposed suspicionless drug testing program at issue in *Chandler*, the Court noted that "[n]othing in the record hints that the hazards respondents broadly describe are real and not simply hypothetical for Georgia's polity."  520 U.S. at 319.  The Court made clear that its own precedents "establish that the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."  520 U.S. at 318.  Georgia's asserted governmental interest in mandating drug testing for candidates for public office "rest[ed] primarily on the incompatibility of unlawful drug use with holding high state office….because the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts; and undermines public confidence and trust in elected officials." 520 U.S. at 318.

The broad interests that Georgia asserted in *Chandler*, and which the Supreme Court found insufficient to establish a special need, are no different than the sweeping interests that Florida asserts here.  And, the hazard complained of by the State in this case—illegal drug use by TANF applicants—is no less hypothetical than Georgia's unfounded concerns over drug use among political candidates.  Thus, like the drug testing program at issue here, Georgia's scheme was purely symbolic, as it was "not well designed to identify candidates who violate antidrug

laws." 520 U.S. at 319. *See also Nat'l Fed'n of Fed. Emp.–IAM v. Vilsack*, 681 F.3d 483, 499

(D.C. Cir. 2012) (U.S. Forest Service's random drug testing policy violated the Fourth

Amendment's guarantee against unreasonable searches and seizures; absent "a *demonstrated*

*problem of drug abuse*" among the affected population, the government failed to establish a

special need.") (emphasis added).

Notably, the drug testing protocol in *Chandler* was benign compared to what TANF

applicants underwent in Florida during the four months that drug testing was in effect.   In

*Chandler*, the testing could take place in the office of the candidate's own doctor and the test

results were released only to the candidate, who could then determine how to proceed.  520 U.S.

at 312.   By stark contrast, in Florida, applicants were not entitled to obtain their test results,

which were shared with countless individuals.   *Supra* at 17-18.   Florida's four-month drug

testing program was, therefore, a significantly more offensive invasion of privacy than Georgia's

unconstitutional drug testing scheme in *Chandler*.

The finding of a special need therefore must be based on facts specific to the citizenry

affected by the search.   Without such facts, the State cannot meet its evidentiary burden of

establishing a special need—which the Supreme Court has variously characterized as a

"surpassing safety interest," *Skinner*, 489 U.S. at 634, a "compelling interest in safety," *Von*

*Raab*, 489 U.S. at 672, a "grave safety threat," or a "concrete danger," *Chandler*, 520 U.S. at

316, 319—to excuse the normal Fourth Amendment requirement of individualized suspicion.

### 2.  Two Sets of Florida TANF Drug Testing Data Show No Special Need

This Court has the benefit of reviewing two sets of data arising from drug testing Florida

TANF applicants: the 2011 program instituted before it was enjoined by this Court, which

yielded statewide results, and the 2001 Crew and Davis study, which covered eleven counties

across the State.  Only **2.6%** of TANF applicants who were tested statewide between July 1 and

October 24, 2011, yielded positive results.  *Supra* at 19.[44]  The only prior Florida-specific data,

from the Crew and Davis study, indicated a test failure rate of **5.1-5.2%** among those flagged by

SASSI screening as potential abusers.  Dkt.32-1 at 15 (5.2%); Dkt.22-2 (5.1%).  Importantly,

Crew and Davis determined unequivocally that *regardless* of the rate, "individuals who screen

and test positively for substance abuse are just as likely to work as are those who screen and test

negatively."  Dkt.2-1 at 31.

In a vain attempt to impeach two sets of Florida-specific TANF drug testing data, the

State's expert witness, Dr. Avram Mack, who is a psychiatrist, not a social scientist, employed a

basic Internet search to arrive at his conclusion that the national TANF population "uses drugs"

at a higher rate than the rest of the population.[45]  However, Dr. Mack testified that only a "magic

test" could yield that information.  Dkt.71-2 at 114:4.  He also disclaimed any knowledge about

or research regarding the Florida TANF population specifically, the rates of drug use or abuse in

Florida generally, Mr. Lebron, and the Plaintiff class.  Dkt.71 at 2-3.  Dr. Mack's opinions on the

rate of drug use or substance abuse disorders among TANF recipients are based on outdated

studies of discrete geographic areas distant from Florida (California and Cook County, Illinois,

which Dr. Mack admitted he could not compare to Florida, *see* Dkt.71-2 at 95:10-12) and on

decades-old data.  Dkt.71 at 22.  This Court has already ruled that non-Florida-specific and

outdated studies like those Dr. Mack relied on are "not probative on the issue presented," and it

---

[44] Although a significant number of individuals who were deemed otherwise eligible for TCA did not submit to a drug test, Dkt.77 at ¶24, the potential reasons are legion:  refusing to surrender their Fourth Amendment right, like Mr. Lebron; lacking funds for the test; the absence of any nearby lab; no transportation to a lab; or abandoning the entire application process.  *Id*. at ¶20; *supra* at 16-17.

[45]  When asked to specify what he meant by "uses drugs," Dr. Mack indicated that he was referring to the use of any drug over the course of a 12-month period, including one-time use. *See* Dkt.71-1 at 16-19; Dkt.71-2 (Deposition of Dr. Mack).

should, at this summary judgment stage, reject similar studies as not probative of any special need.  Dkt.33 at 24.[46]

### 3. Drug Testing TANF Applicants is Not Necessary for Child Welfare or Job Readiness

The State argues that its suspicionless drug testing scheme is justified by special needs, namely that it is necessary to protect the children of TANF recipients and to ensure that said recipients are able to search for and secure employment.  But, the State has provided this Court with no evidence to support those contentions.  *Supra* at 12-15, 19.  *See Marchwinski*, 113 F. Supp. 2d at 1141- 42, *aff'd by evenly divided en banc court*, 60 Fed. Appx. 601 (6th Cir. 2003) ("Since TANF generally, and Michigan's FIP [Financial Independence Program] specifically, are not designed to ameliorate child abuse or neglect, the State cannot legitimately advance such abuse or neglect as supporting a special need sufficient to single out FIP recipients for suspicionless drug testing.  In other words, the State's financial assistance to parents for the care of their minor children through the FIP cannot be used to regulate the parents in a manner that erodes their privacy rights in order to further goals that are unrelated to the FIP.").[47]

Child welfare is governed by Ch. 39, Florida Statutes.  However, not every Child Protective Services investigation gives rise to drug testing, and parents who have a drug use or substance abuse problem do not necessarily have their children removed from the home.  *Supra*. at 12.  Further, if an individual undergoing substance abuse treatment begins receiving TANF, their cash benefits do not stop because they are in treatment.  *Id.* at 15 n.24.  Indeed, in draft bill

---

[46]  Nor was Dr. Mack able to impeach the Crew and Davis study.  He critiqued their finding of the rate of drug use on the ground that the study's terminology was faulty, yet ignored the researchers' careful distinctions between drug **abuse**, which the SASSI screening was designed to detect, and drug **use**, for which the selected applicants' urine was tested. Dkt.22-2 at 5-7.

[47]  FIP is the Michigan equivalent of TCA, administered through the TANF program.  113 F. Supp.2d at 1135.

analyses, DCF analysts warned that HB 353 could *harm* children and families, but the analysts were directed to, and did, delete or rephrase those warnings at the behest of the Governor. *Id.* at 6-7.  DCF also predicted that the cost of drug tests would prohibit individuals from applying. *Id.* at 6-7.  Child welfare specialists decried the practice of reporting positive tests to the Abuse Hotline, as a positive test did not, in and of itself, indicate child abuse or neglect. *Id.* at 12-14. The Parent in Need of Assistance investigations that arose from the Abuse Hotline reports were, at times, based on incorrect test reviews.  Yet, the results of those investigations remain on record. *Id.* at 14.[48]

Nor does the record support the notion that "employment readiness" is a special need. Indeed, the Crew and Davis study concluded precisely the opposite: that there was no discernible correlation between the results of a drug test and the rate of employment among TANF recipients.  Furthermore, no special training is needed to provide a urine sample.  Any assertion that drug testing TANF applicants will help them secure employment simply assumes that TANF applicants use drugs.  Moreover, in most instances, employers would not know whether a prospective employee had undergone a drug test, and a Workforce District Director did not know whether the testing had *any* effect on placing TANF applicants with employers. *Supra* at 19. Finally, Mr. Lebron's current employer's drug testing policy further belies the State's claims that drug testing Mr. Lebron when he applied for TANF was necessary for "job readiness."

---

[48]  The Agency's untimely reversal on reporting positive test results to the Abuse Hotline, *see* Fla. Admin. Code 65A-4.221 (2012), cuts against the State's asserted special need.

### D. Plaintiff Lebron Did Not Consent to Urinalysis Testing, Which Was an Unconstitutional Condition

Mr. Lebron unequivocally revoked any "consent" the State may argue it extracted. Dkt.33 at 18; Dkt.1 ¶11; Dkt.2-1 ¶21. However, even if this Court were to determine that Mr. Lebron failed to revoke his consent, conditioning any individual's application for TCA benefits[49] on suspicionless drug testing violates the unconstitutional conditions doctrine, which prohibits government actors from restricting the exercise of a constitutional right in exchange for another right or discretionary benefit. *Perry v. Sinderman*, 408 US 593, 597 (1972). The doctrine is based primarily on the notion that the government may not accomplish indirectly—by coercively withholding a right or privilege—what it cannot do directly. *Elrod v. Burns*, 427 U.S. 347, 359 (1976); *Frost v. R.R. Comm'n of State of Cal.*, 271 U.S. 583, 593 (1926).

Under Florida law, "[a]n individual has the right to apply for assistance, to have eligibility determined, and if found eligible, to receive benefits." Fla. Admin. Code 65A-1.204(1) (as amended June 4, 2012). Thus, although Mr. Lebron has no "right" to receive TCA, he has the right to *apply* for TCA free from an unreasonable search; the State may not "deny a benefit to a person on the basis that infringes on his constitutionally protected interests." *Perry*, 408 U.S. at 597; *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). *See also Johnston v. Tampa Sports Auth.*, 530 F.3d 1320, 1326 (11th Cir. 2008) ("Consent is not voluntary if the government conditions receipt of a right or a benefit on the relinquishment of a constitutional right."); *Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004) ("The doctrine of unconstitutional conditions prohibits terminating benefits, although not classified as entitlements, if the termination is based on motivations that other constitutional provisions proscribe.")

---

[49] Applicants had to first "consent" to the testing before proceeding further with their application. Dkt.19-3 at 11-12.

(citation omitted); *United States v. Scott*, 450 F.3d 863, 874-75 (9th Cir. 2006) (waiver of Fourth Amendment rights is limited by unconstitutional conditions doctrine; "Nevada's decision to test Scott for drugs without probable cause does not pass constitutional muster under any of the three approaches: consent, special needs or totality of the circumstances.   Since the government concedes there was no probable cause to test Scott for drugs, Scott's drug test violated the Fourth Amendment.").   *See also Shapiro v. Thompson*, 394 U.S. 618 (1969) (conditioning Aid to Families with Dependent Children on residency requirements violated Equal Protection Clause); *Sherbert v. Verner*, 374 U.S. 398 (1963) (conditioning welfare benefits upon a person's refusal to work on Saturdays for religious reasons was unconstitutional).

### E. TANF Applicants Retain an Undiminished Expectation of Privacy in Their Bodily Fluids

Neither the prevalence of drug testing in the private sector, nor the disclosure by TANF applicants of other personal information, diminish TANF applicants' expectation of privacy in their bodily fluids.   The Fourth Amendment standard of reasonableness limits only government actors.   Any comparison to the practices of private actors is irrelevant.   *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) (purpose of a Bill of Rights was to "withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials").   *Cf. United States v. Jones*, 132 S. Ct. 945, 947 (2012) (noting that an individual's "Fourth Amendment rights do not rise or fall with the *Katz* [reasonable expectation of privacy] formulation.   *See also AFSCME v. Scott*, -- F. Supp. 2d --, 2012 WL 1449644; Dkt.33 at 14 n.5 ("Against this controlling authority, the Court declines the State's invitation (Dkt.24) to review current private organizations' practices or public opinion polls to conclude that there no longer exists a reasonable expectation of privacy against state intrusion via urinalysis drug

testing.  Private employers are not constrained by the limits of the Fourth and Fourteenth Amendment in this regard.").

D. Mark Wilson, the State's purported expert witness on the prevalence of drug testing in the private sector and the public's alleged "acceptance" of the practice is not qualified to render the opinions he formulated.  *See* Dkt.70.  Mr. Wilson knows nothing about TANF applicants or recipients in Florida, and does not allege that said applicants or recipients expect to be drug tested in the workplace.  *Id.* at 14.  For Mr. Wilson's opinion to be even remotely relevant to the establishment of a special need, he would have to establish, at the very least, that Florida's TANF applicants are likely to enter occupations in which drug use presents unusual risks, and in which drug testing is therefore customary.  *See AFSCME v. Scott*, -- F. Supp. 2d --, 2012 WL 1449644, at *9 ("Most, if not all of the Governor's supporting exhibits lack probative value because they operate at such a high level of generality. . . . The studies do not describe the risks associated with drug users performing the specific jobs held by the Florida state employees covered by the [executive order requiring drug testing].").

Further discrediting Mr. Wilson's report, and the State's argument that TANF applicants have a diminished expectation of privacy, Mr. Lebron secured employment as a contract employee (associate accountant) for Walt Disney World.  The outsourcing company that employs him on behalf of Disney drug tests its employees under only the narrowest of circumstances, *i.e.*, "when an on-the-job accident requiring medical attention occurs, as allowed by law."  *Supra* at 18 n.37.  The company also pays for the testing.  *Id.*  Aside from the irrelevance of private sector practices to Constitutional protections, clearly there is no universal drug testing requirement in the private sector.  Moreover, Mr. Lebron's most recent employment

belies the notion that TANF applicants are more likely to enter fields in which suspicionless drug testing is customary.

Mr. Lebron's disclosures of financial information, and his son's immunization records, do not lessen his expectation of privacy regarding his bodily fluids. By attempting to equate what the Constitution demands with what the private sector tolerates, the State seeks to substitute a lax "rational basis" standard for the requisite, more robust Fourth Amendment mandate. *See, e.g.*, *Bourgeois,* 387 F.3d at 1323 ("[w]e have said that any restriction must be 'reasonable,' meaning 'not the anemic simulacrum of a constraint on governmental power found in the Due Process Clause's 'rational basis' test, but rather a more robust notion of 'reasonableness' such as that applied in the Fourth Amendment context.") (quoting *Holloman v. Harland*, 370 F.3d 1252, 1271 (11th Cir. 2004)) (emphasis added).

When it comes to Plaintiffs' expectation of privacy in his bodily fluids, the Fourth Amendment's "robust notion of reasonableness" controls. *See Vilsack*, 681 F.3d at 494 (despite prior notice of drug testing policy that was not implemented, and background checks that included "inquiries into their residential, educational, employment, and military histories, as well as any illegal drug use within the past year," forest service employees retained "robust" expectations of privacy). In sum, Plaintiffs did not abandon expectations of privacy in their bodily fluids when they applied for temporary assistance from the government.

### III.     Conclusion

Based upon the foregoing undisputed material facts, arguments, and authorities, Plaintiffs respectfully request that this Court grant them final summary judgment and declare Fla. Stat. §414.0652 facially unconstitutional as a violation of Plaintiffs' Fourth and Fourteenth Amendment rights.

Dated this 10th day of September, 2012

Respectfully submitted,

*/s/ Maria Kayanan*
Maria Kayanan (Fla. Bar No. 305601)          Randall C. Berg, Jr. (Fla. Bar No. 318371)
mkayanan@aclufl.org                          RBerg@FloridaJusticeInstitute.org
Randall C. Marshall (Fla. Bar No. 181765)    Shawn A. Heller (Fla. Bar No. 46346)
rmarshall@aclufl.org                         Sheller@FloridaJusticeInstitute.org
Shalini Agarwal (Fla. Bar No. 90843)         Florida Justice Institute, Inc.
sagarwal@aclufl.org                          100 SE Second St., Ste. 3750
ACLU Foundation of Florida, Inc.             Miami, FL 33131-2115
4500 Biscayne Blvd., Suite 340               Tel: (305) 358-2081
Miami, Florida 33137-3227                    Fax: (305)358-0910
Tel: 786-363-2700
Fax: 786-363-3109

Jason Williamson (*pro hac vice*)
jwilliamson@aclu.org
ACLU Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-284-7340

### CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which automatically serves all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By:     */s/ Maria Kayanan*