**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**LUIS W. LEBRON,**
**Individually and as Class Representative,**

       **Plaintiff**,

**v.**                                          **Case No.: 6:11-cv-1473-MSS-DAB**

**DAVID E. WILKINS[1],**
**In his Official Capacity as Secretary of the**
**Florida Department of Children & Families,**

       **Defendant**.
_____

**ORDER**

     **THIS CAUSE** comes before the Court for consideration of Plaintiff's Motion for Summary Judgment (Dkt. 78); Defendant's Motion for Summary Judgment (Dkt. 79); Defendant's Response to Plaintiff's Motion for Summary Judgment (Dkt. 83); Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (Dkt. 82); Plaintiff's Reply in Support of his Motion for Summary Judgment (Dkt. 84); and Defendant's Reply in Support of his Motion for Summary Judgment (Dkt. 85).  Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment, as described herein.

_____

[1] David Wilkins no longer serves as the Secretary for the Florida Department of Children and Families. Thus, the action proceeds generically against the Secretary for the Florida Department of Children & Families.

## I.  BACKGROUND

### 1.  Procedural History

On September 6, 2011, Plaintiff, on behalf of himself and a class of persons similarly situated, filed this action against Defendant.  (Dkt. 1)  In his complaint, Plaintiff seeks a declaration that Section 414.0652, Florida Statutes, which requires all applicants for Temporary Assistance to Needy Families ("TANF") to submit to suspicionless drug testing, violates the Fourth Amendment's right to be free from unreasonable searches.  Plaintiff also seeks a permanent injunction enjoining the State from enforcing the law.  Simultaneous with his complaint, Plaintiff also filed a motion for preliminary injunction against Defendant.  (Dkt. 2)

On October 24, 2011, after finding Plaintiff was substantially likely to succeed on the merits of his challenge to the constitutionality of the statute, this Court issued a preliminary injunction, temporarily enjoining enforcement of the statute until the case was resolved on the merits.[2]  (Dkt. 33)  At the time the Court entered the preliminary injunction, the Court denied Plaintiff's motion for class certification without prejudice based on the State's stipulation that it would "apply [the Court's] ruling to all persons similarly situated to Plaintiff" without the need for class certification.  (Dkt. 33 at 37) Defendant appealed this Court's preliminary injunction to the United States Court of Appeals for the Eleventh Circuit.  The parties never sought a stay of this matter pending appeal.  On September 10, 2012, while the Court's preliminary injunction Order was on appeal, and before an opinion was issued by the Eleventh Circuit, the parties filed the

---

[2] The Court set forth the full analysis of the development of the governing law regarding the government's authority to conduct warrantless searches in the Court's Order granting the Motion for Preliminary Injunction.  See Lebron v. Wilkins, 820 F. Supp. 2d 1273 (M.D. Fla. 2011).  The Court incorporates that law here by reference.

instant motions for summary judgment with this Court.  (Dkt. 78; Dkt. 79)   On February 26, 2013, while the parties' cross-motions for summary judgment were pending before this Court, the Eleventh Circuit issued an opinion affirming this Court's preliminary injunction Order.  See Lebron v. Sec'y, Florida Dep't of Children & Families, 710 F.3d 1202 (11th Cir. 2013).

Defendant petitioned the Eleventh Circuit for a rehearing en banc.  Defendant's petition was denied on April 23, 2013.  The resulting mandate was issued on May 7, 2013.  On May 8, 2013, this Court, being aware that the parties' cross-motions for summary judgment were filed without the benefit of the Eleventh Circuit's rulings on key legal issues in this matter, granted the parties an opportunity to file additional briefs to address any additional issues in this case before the Court issued a ruling on the parties' motions for summary judgment.  (Dkt. 97)  No additional memoranda were filed.  Thus, the parties' cross-motions for summary judgment are now ripe for adjudication before this Court.

## 2.  The Plaintiff

At the time this case was filed, Plaintiff Luis Lebron ("Plaintiff") was a thirty-five year old, single father with sole custody of his five-year-old son.  (Dkt. 77 at 27; Dkt. 1)  He lived with and cared for his disabled mother.  (Dkt. 1)  Plaintiff is a veteran of the United States Navy.  (Dkt. 77 at 28)  In July 2011, Plaintiff applied to the Florida Department of Children and Families ("DCF") for benefits under the federal TANF program to support himself and his minor child.  (Id. at 32)  Though Plaintiff claims he has never used illegal drugs, and no evidence was offered to the contrary, Section 414.0652 required him to submit to drug testing as a condition of eligibility for TANF benefits.  Plaintiff refused to take a drug test, believing that the State's requirement that

he pay for, and submit to, such a test is unreasonable when there is no reason to believe that he uses drugs.  DCF determined that but for his failure to provide proof that he has tested negative for controlled substances, Plaintiff was eligible for TANF benefits.  (Id. at 33)  Plaintiff initially executed a form consenting to the drug testing required by Section 414.0652, but he later revoked that consent.  (Id. at 34).  Thereafter, Plaintiff was deemed ineligible for benefits under the program.

### 3.  TANF Program

The TANF program was created by Congress on August 22, 1996, as part of the Personal Responsibility and Work Opportunity Act, 42 U.S.C. §§ 601 et seq.  The Act was intended to provide states with resources and flexibility to operate programs designed to meet the following goals:

> (1)   provide assistance to needy families so that children may be cared for in their own homes or in the homes of relatives;

> (2)   end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage;

> (3)   prevent and reduce the incidence of out-of-wedlock pregnancies and establish annual numerical goals for preventing and reducing the incidence of these pregnancies; and

> (4)   encourage the formation and maintenance of two-parent families.

See 42 U.S.C. § 601(a).

To become eligible to receive TANF funds, a state must submit a plan that outlines how it intends to administer its program and set eligibility requirements for families that apply for assistance.  42 U.S.C. § 602(a).  Florida began disbursing TANF funds in 1996 pursuant to Chapter 414, Florida Statutes.  See FLA. STAT. § 414.025 et seq. (1996).  To participate in Florida's TANF program, an individual must complete an

application and meet certain eligibility requirements.  (Dkt. 77 at 3)  The application requires disclosure of certain information, such as medical history, immunization records, living arrangements, social security numbers, family income, employment history, and job-search activities.  (Id.)  Participants in the TANF program must meet a host of work-search and job training requirements to remain eligible unless excused for certain enumerated reasons.  (Id. at 6)  In Florida, an individual may participate in TANF for a lifetime maximum of 48 months, although those months need not be consecutive. (Id. at 10)  TANF is limited to families with children and expectant mothers.  FLA. STAT. § 414.095.  For a family of two (a single parent with a minor child, like the Plaintiff and his son in this case), the maximum TANF cash benefit (known as Temporary Cash Assistance, or "TCA") is currently $241.00 per month.  (Dkt. 77 at 11).

### 4.  Section 414.0652

The statute at issue in this case was enacted in May 2011.  See FLA. STAT. § 414.0652 (2011).  Pursuant to Section 414.0652, all applicants who are otherwise qualified for Temporary Cash Assistance under TANF are required to provide, to a DCF-approved laboratory, a sample of their urine to be tested for the following substances: Amphetamines, Methamphetamines, Cannabinoids (THC), Cocaine, Phencyclidine (PCP), Opiates, Barbiturates, Benzodiazepines, Methadone, and Propoxyphene. Individuals are not tested for the use of alcohol under the statute.  (Dkt. 77 at 13). Pursuant to the statute, DCF is required to "[a]dvise each individual to be tested, before the test is conducted, that he or she may, but is not required to, advise the agent administering the test of any prescription or over-the-counter medication he or she is taking."  FLA. STAT. § 414.0652(2)(d).

The statute makes the cost of the drug test the responsibility of the individual being tested, who is reimbursed only if that individual tests negative for controlled substances. FLA. STAT. §§ 414.0652(1), (2)(a). The law does not apply to individuals not seeking TANF benefits but participating in the Supplemental Nutrition Assistance Program ("SNAP" or food stamps), Medicaid, or the Refugee Assistance Program. (Dkt. 77 at 14).

Under Section 414.0652, DCF is required to "[p]rovide notice of drug testing to each individual at the time of application," to "advise the individual that drug testing will be conducted as a condition for receiving TANF benefits," and to "advise that the required drug testing may be avoided if the individual does not apply for TANF benefits." FLA. STAT. § 414.0652(2)(a). Each "individual to be tested [must] sign a written acknowledgment that he or she has received and understood [this] notice and advice." Id. at (2)(e). Initially, DCF required that positive drug test results be reported to the statewide Child Abuse Hotline. However, in March of 2012, following this Court's preliminary injunction, DCF implemented FLA. ADMIN. CODE 65A-4.221, reversing the Hotline referral policy. (Dkt. 77 at 17) The administrative rule provides, in pertinent part, that "positive drug test results obtained by the Department pursuant to Section 414.0652, F.S., will not be reported to the Florida Abuse Hotline or to law enforcement entities or officers." See FLA. ADMIN. CODE 65A-4.221.

If an individual tests positive, he or she is ineligible to receive TANF benefits for one year after the date of the positive test, except that the individual may reapply for those benefits after six months if the individual can document the successful completion of an approved substance abuse treatment program. FLA. STAT. §§ 414.0652(1)(b), (2)(j). If a parent is deemed ineligible for TANF benefits as a result of a failed drug test

conducted under the statute, an appropriate protective payee shall be designated to receive benefits on behalf of the child.  Id. at (3)(a)-(b).  That designated individual must also undergo drug testing before being approved to receive benefits on behalf of the child.  Id. at (3)(c).

### 5. The Drug-Testing Program's Brief Implementation

Section 414.0652 was implemented from July 1, 2011, until October 24, 2011, when this Court entered the preliminary injunction.  During the brief period the drug testing program was in effect, 4,046 TANF applicants submitted to testing.  Of those tested, 108 TANF applicants tested positive for drug use.  (Dkt. 77 at 24)  Of those 108 individuals, 44 tested positive for cannabinoids (marijuana); 24 for benzodiazepines; 10 for cocaine; 9 each for barbiturates and opiates; 10 for methadone; 3 for propoxyphene; 5 for amphetamines or methamphetamines; and 2 for PCP.  (Id.)[3]  During that same time period, 3,938 individuals tested negative for drug use.  In short, only about 2.6% of TANF applicants who were tested between July 1 and October 24, 2011, tested positive for drug use.

Additionally, there were 2,306 individuals from whom DCF did not receive drug test results, apparently because they were never tested.  (Id.)  These persons were otherwise TCA eligible.

Because of the Court's preliminary injunction, DCF suspended the testing program statewide, approved all applications that had been pending for drug testing, and approved TCA benefits for individuals who had tested positive, notwithstanding their positive drug test results.  (Id.)  After the preliminary injunction was entered, DCF

---

[3] It is unclear for which substance one remaining individual tested positive.

restored TCA benefits to approximately 1,727 families and reimbursed TANF applicants for their drug tests to the extent they had not already been reimbursed. (Id. at 25).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by demonstrating that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value."). If material issues of fact exist that would not allow the Court to resolve an issue as a

matter of law, the Court must not decide them, but rather, must deny the motion and proceed to trial.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999) (quoting Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1369 (11th Cir. 1982)).

## III.  DISCUSSION

The legal question presented before this Court is whether Section 414.0652, Florida Statutes, which requires all applicants for TANF benefits to submit to suspicionless drug testing, is constitutional under the Fourth and Fourteenth Amendments.  Defendant is correct that the concurring opinion in Lebron remarked that the Eleventh Circuit had not resolved the ultimate question of the constitutionality of the drug testing scheme.[4]  Even so, the Eleventh Circuit's legal rulings appear to have foreclosed all but one of the bases on which the State seeks to preserve the constitutionality of the law.  That remaining issue, whether the prevalence of drug use alone within a segment of the population receiving state funding can support mandatory, suspicionless drug testing of that entire population, was called into substantial question,[5] and the record now before this Court fails to support the State's asserted authority.  Thus, for the reasons set forth below, and with the benefit of the rulings and analysis of the Eleventh Circuit Court of Appeals, the Court declares the statute facially unconstitutional and permanently enjoins the State from reinstating and enforcing the law.

As an initial matter, there can be no doubt that Plaintiff mounts a facial challenge to the statute.  In the complaint, Plaintiff argues that "the law is facially unconstitutional,"

---

[4] Lebron v. Sec'y, Florida Dep't of Children & Families, 710 F.3d 1202, 1218 (11th Cir. 2013) (Jordan, J., concurring).

[5] "[W]e in no way are suggesting that evidence of drug use within the TANF population would, in and of itself, suffice to establish a substantial special need for mandatory drug testing.  Nor do we read any of the Supreme Court's drug testing cases to say that empirical evidence of drug use is sufficient to establish a special need."  Lebron, 710 F.3d at 1212 n.7.

and he seeks a declaration to that effect.  (Dkt. 1 at 38)  Likewise, in both Plaintiff's and the State's motions for summary judgment, the Parties assert that the issue before the Court is the facial validity of Section 414.0652.  See (Dkt. 78 at 3, 34; Dkt. 79 at 1) Plaintiff, therefore, must meet a demanding standard.   "A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself.  When a plaintiff mounts a facial challenge to a statute or regulation, the plaintiff bears the burden of proving that the law could never be applied in a constitutional manner.  Put another way, the challenger must establish that no set of circumstances exists under which the Act would be valid."   Am. Fed'n of State, County & Mun. Employees Council 79 v. Scott, 717 F.3d 851, 863 (11th Cir. 2013) ("AFSCME") (internal citations, quotations, and alterations omitted).   Moreover, the "no set of circumstances" standard also "applies when a court grants relief that is quasi-facial in nature—that is, relief that reaches beyond the plaintiffs in a case." Id.

The Fourth Amendment to the United States Constitution protects the rights of the people to be "secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV.  It is well established that mandatory drug testing by the government is considered a search under the Fourth Amendment and is subject to the Fourth Amendment's reasonableness requirement.  See Lebron, 710 F.3d at 1206 (citing Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989); Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989); Chandler v. Miller, 520 U.S. 305, 313 (1997); Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646 (1995); Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822 (2002)).   In Skinner, the seminal case on this issue, the Supreme Court held that the "collection and testing of urine intrudes upon expectations of privacy that society has long recognized

as reasonable" and that "these intrusions must be deemed searches under the Fourth Amendment."  489 U.S. at 617.

The Fourth Amendment, as applicable to the states through the Fourteenth Amendment, does not prohibit all searches; only unreasonable searches are unconstitutional.  Skinner, 489 U.S. at 619.  "To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." Chandler, 520 U.S. at 313.

In its review of this matter on appeal, the Eleventh Circuit made clear that in most cases this standard is met only when a search is accomplished pursuant to a judicial warrant issued upon a showing of probable cause.  Lebron, 710 F.3d at 1206.  Thus, the Court stated: "[T]he Supreme Court has upheld as reasonable searches without a showing of individualized suspicion in certain very limited and exceptional circumstances."  Lebron, 710 F.3d at 1206-07 (citing New Jersey v. T.L.O., 469 U.S. 325, 351 (1985)).  As the Eleventh Circuit explained,

> to establish these limited and exceptional circumstances that justify the suspension of Fourth Amendment protections, the Supreme Court has required the government to make a threshold showing that there are special needs, beyond the normal need for law enforcement, which make the warrant and probable cause requirement impracticable.

Id. at 1207 (citing Skinner, 489 U.S. at 619) (internal quotations omitted).  "Not only must the government identify the special needs that make the warrant and probable cause requirement impracticable, it must establish that those special needs are substantial."  Id. (citing Chandler, 520 U.S. at 318) (internal quotations omitted).  The Court went on to note that only if the government is able to satisfy the threshold showing of a substantial special need for drug testing will the court thereafter undertake

to balance the competing private and public interests advanced by the parties to determine the reasonableness of the search.  Id.

In the specific context of government-mandated drug testing programs, the Supreme Court has limited its exemptions of such programs from the Fourth Amendment's warrant and probable cause requirements only where the asserted need for suspicionless searches fits within the "closely guarded category" of constitutionally permissible justifications.  See Lebron, 710 F.3d at 1207 (citing Chandler, 520 U.S. at 309).  "To fall within this closely guarded category, the Court has made clear that its precedents establish that the proffered special need for drug testing must be substantial."  Id. (citing Chandler 520 U.S. at 318).  As the Eleventh Circuit explained, "the [Supreme] Court has recognized [only] two concerns that present such exceptional circumstances which are sufficiently substantial to qualify as special needs meriting an exemption to the Fourth Amendment's warrant and probable cause requirement: the specific risk to public safety by employees engaged in inherently dangerous jobs, and the protection of children entrusted to the public school system's care and tutelage."  Id.

With regard to the need of ensuring public safety, the Supreme Court in Skinner and Von Rabb recognized sufficiently substantial "special needs" where railroad employees were engaged in safety-sensitive tasks, Skinner, 489 U.S. at 620, and where the sensitive positions of certain United States Customs employees presented extraordinary safety and national security hazards, Von Raab, 489 U.S. at 666.  In Skinner, for instance, the Federal Railroad Administration found that alcohol and drug abuse by railroad employees posed a serious threat to safety after evidence showed that alcohol or drug abuse was a factor in several accidents that resulted in numerous fatalities, other injuries, and property damage.  489 U.S. at 607.  In response, the

Federal Railroad Administration promulgated regulations that required employees involved in train accidents to take blood and urine tests. Id. at 606. The safety-sensitive duties tasked to the railroad employees supported the Court's determination that the government had met the required showing of a special need, to wit, ensuring the safety of the traveling public and of the employees themselves. This need, the Court concluded, justified a policy prohibiting the use of alcohol or drugs while on duty. Id. at 620–21. The Supreme Court also explained that the delay required to procure a warrant to determine whether a violation of the prohibition had been committed could result in the destruction of valuable evidence of drug and alcohol use, and adherence to normal probable cause and warrant requirements would frustrate the compelling government interest in railway safety. Id. at 623.

Similarly, in Von Rabb, the Supreme Court upheld a United States Customs Service policy that made drug testing a condition of working in positions directly involving drug interdiction or requiring the employee to carry a firearm. 489 U.S. at 660-61. The Court explained that the Customs Service, "in performing its almost unique mission," id. at 674, was our "first line of defense . . . against the veritable national crisis in law enforcement caused by smuggling of illicit narcotics." Id. at 668 (internal quotations and citations omitted).

In the context of public schools, the Supreme Court has determined that the warrant requirement would "unduly interfere with the maintenance of swift and informal disciplinary procedures that are needed" and that "strict adherence to the requirement that searches be based upon probable cause would undercut the substantial need of teachers and administrators for freedom to maintain order in the schools." Vernonia, 515 U.S. at 653 (quoting T.L.O., 469 U.S. at 340). Thus in Vernonia and Earls, the

Court upheld as reasonable under the Fourth Amendment school district policies that provided for random drug testing of public school children who participated in the school systems' athletics programs and non-athletic extracurricular activities. The Court noted that schools have an important mandate to deter drug use by schoolchildren for whom it has undertaken a special "custodial and tutelary responsibility" in the unique confines of the school setting. Vernonia, 515 U.S. at 665; Earls, 536 U.S. at 834. The Court noted that the government's responsibilities as guardian and tutor of the students in the public school system were "the most significant element[s]" in considering whether the drug testing programs were reasonable. Vernonia, 515 U.S. at 665; Earls, 536 U.S. at 830. The Court also pointed to specific evidence of drug use among the students in the school district at issue in Earls, 536 U.S. at 835, and to evidence that the student athletes at issue in Vernonia were the leaders of the "drug culture" among the students in that district. Vernonia, 515 U.S. at 649.

Conversely, in Chandler, the Supreme Court rejected the State of Georgia's argument that a special need existed to justify mandatory drug testing of all candidates for state public office. 520 U.S. at 318-19. In Chandler, the State of Georgia asserted as a special need the "incompatibility of unlawful drug use with holding high state office" and argued that the "use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions . . . and undermines public confidence and trust in elected officials." Id. at 318. The State of Georgia also argued that the statute "serve[d] to deter unlawful drug users from becoming candidates and thus stop[ped] them from attaining high state office." Id.

The Court reasoned that the cited justifications did not present "any indication of a concrete danger demanding departure from the Fourth Amendment's main rule." Id.

at 319.  The Court noted that the affected officials were not involved in high-risk or safety-sensitive tasks nor were they part of any drug interdiction effort.  Id. at 321-22. The Court also opined that the drug testing regime was "not well designed" to identify drug users because all of those drug users "save for those prohibitively addicted, could abstain for a pretest period sufficient to avoid detection."  Id. at 320-21.  In the absence of any showing that the statute responded to anything more than a "symbolic" need, the Court held that the asserted need did not justify suspicionless drug testing.  Id. at 309, 322.

Against this backdrop, and as the Eleventh Circuit has stated, the initial pertinent inquiry for this Court is "whether there is a special need for mandatory, suspicionless drug testing of TANF recipients when there is no immediate or direct threat to public safety, when those being searched are not directly involved in the frontlines of drug interdiction, when there is no public school setting where the government has a responsibility for the care and tutelage of its young students, and when there are no dire consequences of grave risk of imminent physical harm as a result of waiting to obtain a warrant if a TANF recipient . . . is suspected of violating the law."  See Lebron, 710 F.3d at 1211.  The Eleventh Circuit has held that no such need existed on the record that was before it, and that record has not changed.

The State continues to maintain, as it did before this Court during the preliminary injunction proceedings, and later on appeal before the Eleventh Circuit, that the following interests qualify as special needs sufficiently substantial to permit an exception to the Fourth Amendment in this case: (1) ensuring TANF participants' job readiness; (2) ensuring the TANF program meets its child-welfare and family-stability goals; and (3) ensuring that public funds are used for their intended purposes and not to undermine

public health.  These goals and objectives, while laudable, are insufficient to place the

entire Florida TANF population into that "closely guarded category" of citizens for whom

the Supreme Court has sanctioned suspicionless, mandatory drug testing.  As the

Eleventh Circuit succinctly stated:

> There is nothing so special or immediate about the government's
> interest in ensuring that TANF recipients are drug free so as to warrant
> suspension of the Fourth Amendment.  The *only* known and shared
> characteristic of the individuals who would be subjected to Florida's
> mandatory drug testing program is that they are financially needy
> families with children.  Yet, there is nothing inherent in the condition of
> being impoverished that supports the conclusion that there is a
> concrete danger that impoverished individuals are prone to drug use or
> that should drug use occur, that the lives of TANF recipients are fraught
> with such risks of injury to others that even a momentary lapse of
> attention can have disastrous consequences.

Id. at 1213 (internal quotations and citations omitted).

On remand, the State has offered no other characteristics of this population that

would support a finding that they fall within the "closely guarded category" of individuals

to be identified and subjected to routine, mandatory, warrantless searches that

"intrude[ ] upon expectations of privacy that society has long recognized as reasonable."

Skinner, 489 U.S. at 617.

Further, the State has not shown that suspicionless and warrantless drug testing

is even necessary to address the State's alleged concerns in this case.  The Eleventh

Circuit ruled as such when it stated:

> TANF recipients, much like the elected officials in *Chandler* who often
> appear in the limelight of a public stage, are subject to regular oversight
> by Florida's welfare officials as part of verifying their ongoing eligibility
> for the TANF program.  They are certainly far more visible to Florida's
> welfare officials than non-TANF recipient parents struggling with drug
> addiction.  Accordingly, just as the Court in *Chandler* concluded that
> there was no reason why ordinary law enforcement would not suffice to
> deal with drug addicted elected officials, we see no reason why here,
> Florida welfare officials would not be able to address drug addiction

through normal law enforcement methods when, and if, it manifests itself in a given TANF household.

Lebron, 710 F.3d at 1213 n.8 (internal quotations and citations omitted).  Moreover, as the Eleventh Circuit stated, the State has failed to show that the general welfare of children is at greater risk absent its drug testing or that Florida's children will be better protected because of mandatory testing of TANF applicants.  As this Court stated in its preliminary injunction Order, even if a parent tests positive for drugs and is precluded from receiving TANF funds, the TANF program has no impact on the familial and custodial relationships of its would be participants.  Finally, as the Eleventh Circuit explained, the State "has a separate, well-established and comprehensive statutory, administrative and judicial scheme codified in Chapter 39 of the Florida Statutes, which governs Florida's obligation to protect children from child abuse, abandonment, and neglect."  Id. at 1213 (citations omitted).

In sum, the State has failed to show that the TANF program or its recipients in this case fall within the "closely guarded category" for which or for whom the Supreme Court has sanctioned mandatory, suspicionless drug testing.  The State has also failed to show that the statute at issue in this case is otherwise necessary to alleviate the concerns raised by the State.  Accordingly, the Court's analysis as to the constitutionality of the statute should end here.

However, it seems in this case, the State is essentially asking the Court to apply the special needs exception to the Florida TANF population based upon the notion that perceived drug use within that population is itself sufficient to establish a substantial special need in this case.  The State cites no authority to support its contention that a showing of pervasive drug use within an identifiable population is itself sufficient to suspend the constitutional rights of that entire population and subject that population to

suspicionless, warrantless drug testing.   The State persists in this stance even though the Eleventh Circuit has expressed considerable doubt that evidence of drug use within the Florida TANF population, would, in and of itself, suffice to establish a substantial special need for suspicionless, mandatory drug testing of that entire population.  See Lebron, 710 F.3d at 1212 n.7, where the Court stated:

> In pointing out that there is no evidence of a demonstrated problem of drug use within Florida's TANF population to support the State's special needs argument, we in no way are suggesting that evidence of drug use within the TANF population would, in and of itself, suffice to establish a substantial special need for mandatory drug testing.  Nor do we read any of the Supreme Court's drug testing cases to say that empirical evidence of drug use is sufficient to establish a special need.  Instead, all that the Court has said of actual evidence of drug use is that it is neither necessary nor sufficient to establish the type of substantial special needs that permit a drug testing regime to fall within the closely guarded category of permissible suspicionless searches.

The Eleventh Circuit's dicta on this point is compelling.   If the State were allowed to randomly drug test any population of individuals by simply showing evidence of disproportionate drug use within that population, the State's exception would swallow the rule against warrantless, suspicionless drug testing.   If a geographic population were shown statistically to have more prevalent drug use, would persons in the geographic footprint be subject to testing?   If persons in an economic demographic could be shown to have a higher rate of drug use, would all such persons in that economic group be subjected to drug testing?   Even if such suspicionless testing as proposed by the State were limited to those persons receiving state funds, would college students receiving governmental assistance to subsidize their education, for example, be subjected to random, suspicionless drug testing if it could be shown that drug use is demonstrably higher among college students?   The Supreme Court's Fourth Amendment precedent would suggest not.   Moreover, even if it were constitutionally

palatable, no such showing of pervasive drug use among the Florida TANF population has been made on this record.

To be sure, the Eleventh Circuit did not have at its disposal the entire record of drug use evidence the parties proffered to this Court while the appeal was pending. Even considering the State's evidence presented to date, the Court finds that there is no material dispute concerning whether drug use has been shown to be a "demonstrated problem" among Florida TANF recipients.  In fact, the study commissioned by the State undermines its argument on this point.  In 1998, DCF conducted a study known as the Demonstration Project after the State passed legislation requiring the Demonstration Project[6] to test empirically whether individuals who applied for TANF benefits were likely to abuse drugs and whether such abuse affected employment opportunities.  In the study, researchers found a lower rate of drug usage among TANF applicants than among current estimates of the population of Florida as a whole.  This would suggest that TANF funds are no more likely to be diverted to drug use or used in a manner that would expose children to drugs or affect "family stability" than funds provided to any other recipient of government benefits.  The researchers also found no evidence that TANF recipients who screened and tested positive for the use of illicit substances were any less likely to find work than those who screened and tested negative.  To date, the Demonstration Project remains the only competent evidence of record addressing drug use among the Florida TANF population.[7]

---

[6] There are two reports in the record that set forth the results of the Demonstration Project: the Evaluation Report (Dkt. 32-1), which was prepared by Robert E. Crew, Jr. for presentation to the legislature, and the subsequent published version of the evaluation report, Robert E. Crew, Jr. and Belinda Creel Davis, Assessing the Effects of Substance Abuse Among Applicants for TANF Benefits, 17(1) JOURNAL OF HEALTH & SOCIAL POLICY 39 (2003) (Dkt. 22-2).

[7] The Court dismisses the State's argument that the reports setting forth the results of the Demonstration Project, commissioned by the State itself, are inadmissible hearsay.  The Court finds the reports are

Notwithstanding, the State passed and implemented the suspicionless drug testing program at issue here.  In the short time that the program proceeded, the test results were essentially consistent with those of the Demonstration Project, that is, as noted above, the preliminary results showed that only about 2.6% of TANF applicants tested positive for controlled substances.  The state questions the validity of this number by arguing that thousands of eligible TANF applicants failed to take the test because they feared they would fail the test.  Even post the entry of the preliminary injunction, the State has not offered any evidence to support its supposition.  Nor has the State sought, with competent evidence, to dispel or discount the numerous other logical inferences that can be drawn from a TANF applicant's failure to take the test aside from the State's inference here, including: (1) the refusal to surrender one's Fourth Amendment right as is the case for the Plaintiff in this case; (2) the lack of the requisite funds to pay for the test; (3) the absence of a DCF-approved lab near the applicant's location; or (4) the lack of transportation to a DCF-approved lab.  In fact, the undisputed evidence shows that at various points during the program's implementation, some counties had no DCF-approved testing sites.  (Dkt. 77 at 21)

The remaining evidence provided by the State to support its theory of a "demonstrated drug problem" within the Florida TANF population is either inadmissible or irrelevant to the pertinent issue before this Court.  First, the State submits the expert

---

admissible as public records.  See Fed. R. Evid. 803(8).  Alternatively they would be admissible as non-hearsay—that is not offered for the truth of the matter asserted, but offered to prove what information the state had available to it when the statute was enacted.  See U.S. v. Tyrrell, 269 Fed. App'x 922, 930 (11th Cir. 1986) (evidence not offered or admitted for its truth is not hearsay).  In any event, "there is no affirmative burden on the part of the affected population to bring forth evidence refuting the legitimacy of the State's purported special needs for drug testing.  To the contrary, the Supreme Court has unequivocally stated that it is the state which must show a substantial special need to justify its drug testing."  Lebron, 710 F.3d at 1211 n.6 (citations omitted).  Thus, even if the Court excluded the results of the Demonstration Project from consideration, the State would not have met its affirmative duty to establish concrete evidence of a substantial special need in this case.

opinion of Dr. Avram Mack, a practicing psychiatrist.   Dr. Mack's four primary opinions are as follows: (1) drug use has a detrimental effect on individual health, social achievement, the risk of violence or suicide, and antisocial behavior; (2) a parent's use of drugs is detrimental to the well-being of his or her family; (3) drug use has a detrimental effect on job procurement and performance, including among TANF recipients; and (4) drug use among TANF applicants and recipients is greater than among the general population.  (Dkt. 79-12 at p. 9)

The Court finds Dr. Mack's testimony should be excluded as he is not a qualified expert in this case.   Under Federal Rule of Evidence 702, a court can admit relevant expert testimony only if it determines that (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology he uses to reach his conclusion is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact.   See McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002).  Here, Dr. Mack is a practicing psychiatrist and a professor in the Department of Psychiatry at Georgetown University School of Medicine.   While he has authored articles and books on drug related issues, and while he teaches on the subject of drug related disorders, he testified in his deposition that until he undertook to serve as the State's expert in this case, he never studied, produced any surveys, or collected any data on the TANF population in any context.   See (Dkt. 71-2 at 84)  He testified that his opinion in this case is based solely on publications written by other researchers.  (Id. at 85)  He did not personally gather any of the data on the TANF population, and he never conducted any research or compiled any data, peer-reviewed or otherwise, on the TANF population in Florida.  (Id. at 86)   Further, none of the studies cited by Dr. Mack to support his opinions shed any light on the issue of drug use among the TANF population in Florida.

Just by way of example, Dr. Mack cites a study that evaluated all single mothers receiving TANF benefits in Cook County, Illinois in 2003-2004.  This report did not address the TANF population as a whole, as it excluded data related to married mothers or single or married fathers, and it did not concern the Florida population.  Dr. Mack admits that his report does not concern itself with the actual members of the Florida TANF population generally or the Plaintiff specifically.  As he explained: "The report is not about the plaintiff Mr. Lebron individually nor about any individual member of his class.  I have not examined Mr. Lebron or any member of this class and no opinions are given about him or any individual member of this class."  (Dkt. 79-12 at 10)  Thus, his conclusions or "opinions" concerning the detrimental effect of drug use on job procurement and performance in the Florida TANF population are non-existent and his opinions concerning the ills of drug use generally or on other populations not in Florida are of no benefit to the Court in the context of this case.

The State also relies on the declarations of Michael Carroll ("Carroll") and Peter Digre ("Digre"), two lay persons who are employees of DCF, to support the contention that a drug problem exists among the TANF population in Florida.  Carroll is the Regional Managing Director for the SunCoast Region of DCF and Digre is employed by DCF as the Assistant Deputy Secretary for Operations.  (Dkt. 79-11; Dkt. 79-4)  Neither of these individuals was disclosed as an expert witness in this case.  Carroll attested that "through my involvement with the workforce boards, and in my other positions, I have observed firsthand drug use as a substantial barrier to employment with the population *likely* to participate in TANF.  In my experience, I have observed a strong correlation between drug use and unemployability.  In my experience, I have also observed a strong correlation between drug use and poverty."  (Dkt. 79-11 at 8)

(emphasis added).  Carroll also attested that he has "personally observed hundreds of TANF applicants who *appear to be* under the influence of drugs."  (Id. at 13) (emphasis added).   Similar to Carroll, Digre attested that "in [his] experience, [he] ha[s] observed a strong correlation between drug use and poverty" and that "[he] ha[s] personally observed the harms of drug use in the TANF population, including the barrier it presents to self-sufficiency and employment."  (Dkt. 79-4 at 6, 8)

The State further cites the deposition testimony of Bruce Ferguson ("Ferguson"), an employee of First Coast Workforce, a private, not for profit entity, which, among other things, is tasked with assisting individuals who receive public assistance through DCF with obtaining employment training and assistance.  First Coast Workforce's clients, however, are comprised of individuals who are not TANF recipients as well as those who are.  In fact, First Coast Workforce's function extends to a broad range of people, including, felons seeking to re-enter the workforce from prison and youth who are at risk of dropping out of school.  (Dkt. 79-2 at 22-27)  Ferguson testified that one of his job functions is to refer individuals who "self-identify" as having a drug problem to an appropriate facility that provides assistance to such individuals.  (Id. at 47)  Ferguson also testified that over a ninety-day period, forty-two clients self-disclosed that they had either a drug or alcohol problem.  (Id. at 41)

The declarations of Carroll and Digre, as well as the deposition testimony of Ferguson, are inadmissible and cannot be reduced to admissible evidence at trial. Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999) (district court may consider hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial).  First, the conclusory averments of Carroll and Digre, who are not experts on the issue before this Court, that a correlation exists

between drug use, poverty, and unemployability, absent any relevant studies or empirical data to support their opinions, are incompetent as a matter of law.  Likewise the testimony of Carroll that he observed TANF applicants who "appear[ed] to be under the influence of drugs," without any verification or basis to explain his expertise in assessing drug use by observation is of no assistance to the Court in this matter.[8] Ferguson's testimony that unknown and unspecified individuals self-reported their drug or alcohol abuse to him is, likewise, inadmissible; it is comprised of rank hearsay.

Moreover, even if admissible, the testimony of these individuals does not bolster the State's argument.   First, this case does not concern the population *likely* to participate in TANF as Carroll attested, it concerns actual, not hypothetical TANF applicants and the State's burden to show that there is an actual drug problem within that TANF population.   Ferguson's testimony, even if it could overcome its obvious inherent hearsay infirmity, concerning forty-two individuals who reportedly identified as having either a drug or alcohol problem over a ninety-day period is likewise irrelevant. Ferguson does not specify whether all, or any, of these individuals were TANF recipients.   He also makes no distinction among the forty-two individuals who "self-reported" a drug problem and those who reported an alcohol problem.   This is significant because the statute at issue plainly does not test for alcohol abuse or render ineligible TANF recipients who abuse alcohol.

Finally, the State introduces the declaration of Patricia Brown (Dkt. 79-13), a systems project analyst at DCF to support its argument that the rate of drug use among Florida's TANF recipients is greater than the rate of drug use among recipients of other

---

[8] Notably, however, the statute at issue here does not seek to test only those persons who present a suspicion of drug use or probable cause to believe that drug use is present.  The Eleventh Circuit acknowledged that if drug use is apparent there may be other means to address those individuals within existing Fourth Amendment parameters.

government benefits.  In her declaration, Brown attests that she generated a data file listing all recipients of TANF, Medicaid, and SNAP (food stamps) as of March 28, 2012. (Id.)  She then delivered this data file to representatives of the Child Safety and Substance Abuse Mental Health offices within DCF.  (Id.)  She instructed the representatives of these offices to match the records in her data file against their respective data records and to generate reports detailing their findings and send them to her.  (Id.)  She attests that the data match revealed that since 2000 a higher percentage of TANF recipients (9.1%) received DCF-funded substance abuse treatment than Medicaid recipients (4%) and SNAP recipients (6.6%).  (Id.)  She attests that since 2003 a higher percentage of TANF recipients (11%) were identified as "verified perpetrators of abuse or neglect in a child abuse investigation" than Medicaid recipients (4.3%) and SNAP recipients (5%).  (Id.)  Finally she attests that since 2003 a higher percentage of TANF recipients (3.5%) had "verified allegations of substance misuse in a child abuse investigation" than Medicaid recipients (1.1%) and SNAP recipients (1.4%). (Id.)  The State attaches three charts outlining the match and the numbers culled by program offices and attested to by Brown.

Brown's declaration and the charts constitute inadmissible hearsay and, contrary to the State's contention, are not admissible under the business records exception to the hearsay rule.  Pursuant to Federal of Evidence 803(6), business records are admissible as an exception to the hearsay rule "if kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make . . . the data compilation."  See U.S. v. Fernandez, 392 Fed. App'x 743, 746 (11th Cir. 2010) (citation omitted). "The touchstone of admissibility under rule 803(6) is reliability, and a trial judge has broad discretion to determine the admissibility of such

evidence." U.S. v. Arias-Izquierdo, 449 F.3d 1168, 1183 (11th Cir. 2006) (citation omitted).

Against this standard, the Court finds the undisturbed data in the databases used by the representatives of the Child Safety and Substance Abuse Mental Health offices to answer Brown's inquiries was presumably kept in the course of regularly conducted business activity.  However, what is offered here—the data match answers purportedly retrieved and compiled as a result of the data matching exercise and provided by the agency representatives in response to Brown's queries, which themselves were driven by data Brown pulled from her files—were not kept in the course of regularly conducted business activity and it was not the regular practice of DCF to engage in this sort of data matching extrapolation.  Moreover Brown's charts, created to display or condense the various agency responses, were obviously not business records as that term is understood.  See Arias-Izquierdo, 449 F.3d at 1183-84 ("Rule 803(6) requires that both the underlying records and the report summarizing those records be prepared and maintained for business purposes in the ordinary course of business and not for purposes of litigation.").  As Plaintiff argues, the evidence demonstrates that the end product of the data matching exercise was created specifically for this litigation.  In fact, Brown herself, who has worked for DCF since 1984, testified that this particular form of data matching had never previously been undertaken.  See (Dkt. 80-9 at 59)[9]

In any event, even if the Court were to admit Brown's declaration and the associated charts, the evidence bears no relevance to the issue at bar.  Brown's

---

[9] The State does not and could not contend the charts are admissible as a summary of voluminous records because the State has not made available, nor does it argue that it is able to make available, the underlying data (i.e. the various agencies' data) to the Plaintiff or this Court.  See U.S. v. Lezcano, 296 Fed. App'x 800, 808 (11th Cir. 2008) ("[D]ocuments underlying summary exhibit must be made available to [opposing party] for examination.")

declaration and the charts presented contain one critical flaw—the charts evaluate percentages of "substance abuse" and "substance misuse."  (Id.)  The record reveals that the definitions for "substance abuse" and "substance misuse" as used by the offices preparing the charts include, for both terms, the use of alcohol.  (Dkt. 80-8 at 37-38; Dkt. 80-10, pp. 51-52)  As stated, the drug testing conducted pursuant to Section 414.0652 does not test for alcohol use.  Even more troubling, Justin Graham, the representative from the Office of Child Welfare, testified that the term "substance misuse," as it is used in the charts, covers the following areas: (1) using drugs or alcohol; (2) a child inappropriately consuming or being given drugs or alcohol; (3) poisoning of a child due to a caregiver's actions or neglect; and (4) misusing over-the-counter or prescribed drugs.  (Dkt. 80-10, pp. 51-52)  Graham also testified that "there is nothing on the data end that we could do to include or exclude" a child inappropriately consuming Benadryl, for example.  (Id., p. 53)  He further testified that he was not aware of the percentages of individuals who inappropriately used alcohol in the total numbers in the charts, and he conceded that the data "did not screen out over-the-counter-or prescribed drugs." (Id., pp. 53-54).  Thus, it is impossible for this Court to discern from this data any useful information concerning drug abuse among TANF recipients.

Further, the charts do not demonstrate that a higher percentage of the TANF population uses drugs than the populations to which they are being compared.  The first chart compares the percentages of those who received DCF-funded *substance abuse treatment*.  If anything, this number suggests that a higher percentage of TANF recipients sought treatment for substance abuse when compared to other recipients, not that a greater percentage in fact abused drugs or any other substance.  The remaining two charts concern those with "verified allegations of abuse or neglect" and "verified

allegations of substance misuse" in child abuse investigations.   Again, neither the content of these "verified allegations" nor the related outcomes of investigations that these allegations presumably prompted are present in this record.

In sum, there simply is no competent evidence offered on this record of the sort of pervasive drug problem the State envisioned in the promulgation of this statute. Hence, even if the State intended to hinge its demanded exception to the Fourth Amendment on this thin reed, a proposition the Eleventh Circuit already strongly cautioned against, Lebron, 710 F.3d at 1212 n.7, it has failed to make the evidentiary showing that would be required.   Because the State has failed to meet the threshold requirement of establishing a substantial special need, the Court need not weigh any competing individual and governmental interests in this case.   See Lebron, 710 F.3d at 1214.

The State argues, alternatively, even in the absence of a substantial special need to support the drug testing at issue, the statute is constitutional because TANF recipients must consent to the drug test.   (Dkt. 79 at 17)   The State contends that if a TANF applicant objects to the drug testing condition, he is free to decline the offer to participate in the program, and no drug test occurs.   (Id.)   The Eleventh Circuit has foreclosed this argument as well, as a matter of law.   Although a search conducted pursuant to a valid consent is constitutionally permissible, see Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973), a valid consent means one that is in fact freely and voluntarily given.   Lebron, 710 F.3d at 1214.   As the Eleventh Circuit explained, "[t]he State's assertion that the consent that is provided by TANF applicants renders the drug testing reasonable for Fourth Amendment purposes is belied by Supreme Court precedent, which has invalidated searches premised on consent where it has been

shown that consent was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." Id. (internal quotations and citations omitted).  According to the Eleventh Circuit, by:

> informing TANF applicants that the drug test is one of many conditions to receiving this government-issued benefit and that the applicant's refusal to give consent means that he is ineligible to receive TANF assistance, the State conveys a message that it has the unfettered lawful authority to require such drug testing—period.  But it does not and can only do so upon a showing of individualized suspicion or a special need beyond the need for normal law enforcement.

Id. at 1215.

Further, the Court notes that even though the drug testing programs in Skinner, Von Raab, Vernonia, Chandler, and Earls required consent, the Supreme Court has never held that such programs were constitutional simply because of consent.  Rather, the Supreme Court has always applied the same special needs analysis even when it was shown that the affected population had the option to consent to the drug tests.  Thus, as the Eleventh Circuit stated in Lebron, "the constitutional validity of a mandated drug testing regime is [not] satisfied by the fact that a state requires the affected population to consent to the testing in order to gain access or retain a desired benefit." Id.

Finally, the Court finds there is no set of circumstances under which the warrantless, suspicionless drug testing at issue in this case could be constitutionally applied.  In AFSCME, the plaintiff employee Union challenged an Executive Order ("EO") of Florida Governor Rick Scott which mandated random, suspicionless drug testing of all employees in state agencies within his control.  AFSCME, 717 F.3d at 857.  While the Union initially mounted a facial challenge to the EO, by the summary judgment stage the Union "conceded that the Fourth Amendment permitted drug testing

of state employees in safety-sensitive positions." Id. at 861.   The district court granted the Union's motion for summary judgment and enjoined enforcement of the EO as to all 85,000 state employees, without regard to the distinction between safety-sensitive and non-safety-sensitive positions.   Id. at 857.   The Eleventh Circuit reversed, stating that the facial nature of the relief violated the "no set of circumstances" standard, especially in light of the Union's concession that a sub-set of the employees at issue could be constitutionally tested.   Id. at 870.   Here, however, the parties do not identify, and the Plaintiff does not concede, that any sub-set of TANF recipients might constitutionally be subject to the testing at issue, nor is the Court aware of any such group of TANF recipients who could potentially fall within any closely guarded category of individuals who may constitutionally be subjected to suspicionless searches.

## IV.   Conclusion

Accordingly, based on the foregoing, the Court declares Section 414.0652, Florida Statutes, unconstitutional and permanently enjoins enforcement of the law. Consequently, Plaintiff's Motion for Summary Judgment (Dkt. 78) is **GRANTED**. Defendant's Motion for Summary Judgment (Dkt. 79) is **DENIED**.   The Clerk is **DIRECTED** to **ENTER** judgment in favor of the Plaintiff, **TERMINATE** any pending motions, and **CLOSE** this case.

**DONE and ORDERED** in Orlando, Florida, on this 31st day of December 2013.

Copies furnished to:
Counsel of Record
Any Unrepresented Parties

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE